[No. C036987. Third Dist. Dec. 10, 2001.]

MARIO SOLIS et al., Plaintiffs and Appellants, v.
KIRKWOOD RESORT COMPANY, Defendant and Respondent.

356

## COUNSEL

Gerard A. Rose, Thomas J. Dunnion and Todd D. Reeves for Plaintiffs and Appellants.

McKinley & Smith, Timothy M. Smith and Gregory W. Koonce for Defendant and Respondent.

## OPINION

**MORRISON, J.**—Mario (plaintiff) and Janelle Solis sued Kirkwood Resort Company (defendant, the true name of which is Kirkwood Mountain Resort, LLC), after a ski accident. The trial court granted defendant's motion for summary judgment, finding plaintiff signed a release of negligence liability which embraced this accident, and that defendant owed no duty to plaintiff under the primary assumption of the risk rule. Plaintiff filed a timely notice of appeal from the ensuing judgment.

We conclude plaintiff established an ambiguity in the release and a jury could find it was not intended to cover this accident. Moreover, there is a critical factual question regarding whether defendant increased the risk of harm to skiers beyond that inherent in the sport. We reverse.

### STANDARD OF REVIEW

Summary judgment is properly granted to a defendant who shows without refutation that a plaintiff cannot establish an essential element of his cause of action or that there is an affirmative defense which bars recovery:

Our review is de novo. (Code Civ. Proc., § 437c, subds. (n), (o)(2); *Jamba-zian v. Borden* (1994) 25 Cal.App.4th 836, 844 [30 Cal.Rptr.2d 768].)

## FACTUAL AND PROCEDURAL BACKGROUND

The complaint alleges Mario Solis was skiing at defendant's resort when, without warning, he entered an area of the resort that had recently been altered to accommodate a ski race. This area now consisted of hazardous man-made jumps, which increased the risk of harm to skiers and caused him to fall down. The complaint raised theories of negligence and premises liability, with a pendent loss of consortium claim for plaintiff's wife, Janelle.

The answer generally denied the allegations and asserted a number of defenses, including a release of liability signed by plaintiff, and primary assumption of the risk.

The undisputed facts show the accident occurred on Sunday, March 28, 1999. Earlier that ski season, plaintiff bought a midweek season pass from defendant, entitled "Season Pass & Liability Release Agreement." This allowed him to use defendant's facilities Monday through Friday for the entire season, except for designated holiday dates. Part of the application for the season pass consists of a release of liability form, the terms of which will be recited in a moment. The entire application is reproduced as an appendix to this opinion. Although a checked box indicates plaintiff bought a "Midweek Plus Season Pass," the parties agree he paid for and obtained the "Midweek Season Pass." In part this states "Pass is only valid Monday through Friday," with certain exceptions not relevant to this case. Because his season pass did not allow weekend usage, in order to ski the Sunday of the accident, plaintiff had to buy a day pass. Defendant does not require purchasers of day passes to sign a release or at least did not require plaintiff to do so.

Defendant produced declarations of two ski patrollers who helped plaintiff after the accident, and supporting documentation including photographs and reports prepared by the ski patrol. The gist of this evidence was that plaintiff, through inattention or for a thrill, skied past a line of crossed bamboo poles, which closed the jumps off from the run plaintiff was using. Defendant acknowledged that that part of the mountain had been turned into a racing start for a special event scheduled for later that day. Defendant also produced portions of plaintiff's deposition, where he described himself as an expert skier. Plaintiff had claimed a mound or "berm" of snow "kicked me into the air."

Plaintiff argued defendant "created a temporary hazard that caused the injury." According to declarations submitted by plaintiff and by his skiing

partner that day, the bamboo warning poles were not erected until *after* the accident. Plaintiff argued the release contained in his season pass application was temporally delimited by the scope of the pass itself, that is, the release was operative only Monday through Friday.

The trial court granted summary judgment, as follows: "Kirkwood's evidence establishes that plaintiff Mario Solis executed a valid, binding, and enforceable contract when he signed the 'Season Pass & Liability Release Agreement.' The court finds that the contract is clear and unambiguous on it[s] face, and specifically finds that the Liability Release contained within the contract is not limited by the type of pass that a skier purchases. The clear intent of the contract is that the Liability Release bars all claims by all season passholders, regardless of the type of pass purchased.

"Plaintiffs do not dispute that the Release is inherently valid and enforceable; instead plaintiff argues that because the accident occurred on a day on which his particular pass was not valid, the Release was also not valid. The Court finds this argument unpersuasive. The Release is not a part of, subordinate to, or governed by the season pass; both are encompassed by the 'Season Pass & Liability Release Agreement.' The obvious intent of that document is that one release shall bind all claims by all passholders.

"The agreement is devoid of language which suggests that the Release's applicability is dependent upon the type of pass. Nor does the language support an interpretation that the Release is only valid on days when the pass is also valid. Such a conclusion contradicts the simple and clear language on the face of the document. The court finds that plaintiff entered the contract without mistake of fact.

"The court finds that plaintiffs' claims are also barred by the doctrine of primary assumption of risk. Plaintiff's descriptions of the terrain feature on which he lost control are inconsistent. Based upon the evidence presented, the court is unable to rule whether the terrain feature is [natural] or man-made. In either event, plaintiffs' evidence does not establish that the terrain feature on which plaintiff lost control increased the risks inherent in the sport. Whether the object was natural or man-made, the evidence supports a finding that it posed a risk inherent in the sport of skiing. Plaintiff's deposition testimony establishes that he was familiar with such risks, and understood that skiers assume the dangers posed thereby. The plaintiffs' claims are, therefore, also barred under the doctrine of primary assumption of risk."

A judgment was entered accordingly and plaintiff filed a timely notice of appeal therefrom.

DISCUSSION

I. *The Release of Liability.*

■ We agree with defendant that releases of negligence claims are not against public policy (*Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608, 619-622 [55 Cal.Rptr.2d 818]), that contract principles apply when interpreting a release, and that normally the meaning of contract language, including a release, is a legal question, not a factual question. (See *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1727 [22 Cal.Rptr.2d 781] (*Westlye*).)

■ A prior release must be " 'clear, unambiguous and explicit' " and "[a] release effective as to one type of misconduct may not be effective as to another." (*Olsen v. Breeze, Inc., supra,* 48 Cal.App.4th at p. 622.) It is sometimes said that a prior release is interpreted more strictly, so as to favor the party releasing liability. (See, e.g., *Westlye, supra,* 17 Cal.App.4th at p. 1728, fn. 7 [citing a learned treatise].) Therefore, an ambiguity about the scope of a release should normally be construed against the drafter, as with other contracts. (See Civ. Code, § 1654 ["In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."]; *Pacific Lbr. Co. v. Ind. Acc. Com.* (1943) 22 Cal.2d 410, 422 [139 P.2d 892]; *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175, 1184 [101 Cal.Rptr.2d 532].)

An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing. (See *Zabetian v. Medical Board* (2000) 80 Cal.App.4th 462, 466 [94 Cal.Rptr.2d 917] [statutory language]; *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 177 Cal.App.3d 855, 859, fn. 1 [223 Cal.Rptr. 246] [contract language].) An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

When an ambiguity is predicated on extrinsic evidence, special rules of interpretation apply. As explained by Bernard Witkin, where the extrinsic evidence points only one way, or is uncontested, the meaning of the language in question may be ascertained as a matter of law and may be reviewed by an appellate court de novo. However, where the extrinsic evidence does not eliminate the ambiguity, that is, make one candidate of

meaning implausible, or where it is contested, an issue of fact arises. In such cases, after a court trial, the appellate court must defer to a trial court's assessment of the extrinsic evidence, as it defers to other factual determinations (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 375-377, pp. 424-427; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 681, p. 615; see *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385].)

■ Here, however, we review a judgment following summary judgment, and we do not defer to the trial court. There are not supposed to be any disputed material facts. For the reasons that follow, we conclude that because of an ambiguity in the release, its scope cannot be resolved on summary judgment. ■ As stated in a case discussing whether a release operated in favor of a third party, "The trier of fact must decide how a reasonable person in the releasing party's shoes would have believed the other party understood the scope of the release. [Citations.] Thus, testimony by the releasing party regarding who *he* thought he was releasing, while it may serve to explain the situation, does not determine the legal effect of the release. [Citation.] How a reasonable person would view the other party's understanding of the release is generally a matter of inference based on the extrinsic evidence. Unless that extrinsic evidence is in conflict, the question is one of law. [Citation.] *On a motion for summary judgment, the court may determine which inferences are 'reasonably deducible from the evidence,' and may grant summary judgment if there is no conflict with other reasonable inferences or evidence."* (*Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 351 [87 Cal.Rptr.2d 856], second italics added.) ■ Here, there are two plausible interpretations of the scope of the release and a jury must resolve its meaning.

The critical portion of the release (with added paragraph numbering) is as follows:

"[1] I understand that the sports of skiing, snowboarding, and other recreational activities involve inherent and other risks of INJURY and DEATH. I voluntarily agree to expressly assume all risks of injury or death that may result from skiing, snowboarding, or any other activity at Kirkwood Resort Company.

"[2] I AGREE TO RELEASE Kirkwood Associates, Inc., d.b.a. Kirkwood Resort Company, its ski shop, snowboard shop, employees, owners, affiliates, agents, landowners, officers, directors (collectively 'PROVIDERS'), from all liability for injury, death, and property loss and damage that results from the passholder's participation in the sport of skiing, snowboarding, or any

other activity at Kirkwood Resort Company including all liability which results from the NEGLIGENCE of PROVIDERS, or any other person or cause.

"[3] I Further agree to defend and indemnify PROVIDERS for any loss or damage arising from claims or lawsuits for personal injury, death, and property loss and damage related to participation in the sport of skiing, snowboarding, or any other activity at Kirkwood Resort Company."

Paragraph 1 is an effort to state acknowledgement of the skier's assumption of the risk. It is grammatically and functionally separate from the release contained in paragraph 2 and does not necessarily bear on the temporal scope of the release, although it does reflect plaintiff's understanding of the dangers of skiing. Similarly, paragraph 3 is an indemnity clause, applicable in cases where a skier causes some event which results in litigation against the resort; it, too, has no obvious necessary bearing on the scope of the release.

Paragraph 2 provides a release of "all liability for injury, death, and property loss and damage that results from the passholder's participation in the sport of skiing, snowboarding, or any other activity at Kirkwood Resort Company including" negligence. Defendant reasons, plausibly, that because the accident occurred while plaintiff was skiing "at Kirkwood Resort Company," and alleges the company's negligence caused the injury, the release operates to bar this lawsuit. This is not only a permissible construction, a purely facial reading of the pass seems to preclude any other view. Further, although paragraphs 1 and 3 do not necessarily pertain to paragraph 2, reading all three paragraphs together suggests an intention to preclude "any" liability by the defendant.

Plaintiff concedes that the language of paragraph 2 of the pass is legally sufficient to bar any claims against defendant *while a skier is skiing under its terms*. However, plaintiff's position is that the release was coextensive with the pass, i.e., the right to ski. Because this pass was not valid on Sundays, and the pass he purchased to allow him to ski that Sunday did not contain a release, plaintiff urges a jury could conclude the mutual contractual intention of the parties limited the ambit of the pass and release to the Monday-through-Friday period in which the pass allowed users to ski. We conclude this is a plausible construction of the release and a jury could find the release does not bar this lawsuit.

In arguing the release in this case necessarily covered the entire ski season, not just the period in which plaintiff had the right to ski, defendant places heavy reliance on *Paralift, Inc. v. Superior Court* (1993) 23

Cal.App.4th 748 [29 Cal.Rptr.2d 177]. But in that case a release "forever" waived a party's right to sue for injuries while parachuting. (*Id.* at pp. 752, 756.) "The term 'parachuting activities' is not limited by time or place, . . ." (*Id.* at p. 756.) Here, the pass does not use similar language, but instead states it is "only valid Monday through Friday."

In *Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733 [93 Cal.Rptr.2d 169], a health club membership form contained a release of liability for negligence arising out of use of the facilities or instruction. (*Id.* at pp. 736-737.) The member later paid extra for personal fitness instruction on the premises, during which instruction she was injured by negligent advice by her trainer. In part she argued her purchase of training sessions constituted a new contract which did not itself contain any release, therefore, she was not barred from suing by the release in the general membership contract. Because that release covered use of the club's equipment, facilities and instruction, the court concluded it barred her claim. (*Id.* at pp. 738-739.) Defendant emphasizes the following passage: "That Lund was required to pay an extra fee for [instruction] services without executing a new waiver and release . . . does not render the 1994 membership contract inapplicable. The release is not limited to activities included in the standard membership. Instead, it expressly applies to any exercise activity and any such activity while being instructed or supervised." (*Ibid.*) We accept this reasoning, but it does not resolve the ambiguity tendered by plaintiff regarding the application of the release *he* signed, which had materially different terms. Although it covered "skiing, snowboarding, or any other activity at Kirkwood Resort Company," this language does not preclude, explicitly or implicitly, the imposition of a temporal component to the scope of the release, as contended by defendant.

Defendant also emphasizes the release absolved it of "all liability," but plaintiff does not challenge this point as such. Instead, plaintiff tenders an ambiguity by pointing to other language making the agreement "valid," meaning operative, only at certain times. As stated above, plaintiff concedes that if the release was operative on weekends, it was phrased in a way that would bar his claims arising out of this accident.

The season pass is a contract. The purchaser obtains a significant financial savings, if he or she uses it often enough, as compared to skiers who purchase day passes. As part of the bargain for a season pass, the purchaser executes a release. Were it not for the release, the cost of a season pass could well be much higher. But plaintiff did not use the pass that Sunday, nor could he. Instead, he purchased the right to use defendant's facilities for that day pursuant to a distinct contract with different terms. His purchase of a day

pass did not require a release. In effect, defendant wants to apply against plaintiff a release that it does not require of other day users, by virtue of his purchase of a season pass. If defendant wants to preclude season pass purchasers from suing regardless of when a claim arises, it could insert language in the season pass to that effect, such as "This release applies as long as the pass is valid, whether or not this pass was used on the day of injury, death, property loss or damage." Or, as in *Paralift*, "This release is valid forever." On this record we cannot say the release at issue accomplishes the same result.

Alternatively, defendant could have required a release of day pass users. But plaintiff's contract to use the facilities on that day is arguably confined to the terms of the day pass, which does not include a release. At least, a triable issue exists as to the applicability of the release that he did sign.

Defendant does not dispute that it drafted the season pass and release. As stated above, a contract should be construed against the drafter, where such construction is semantically reasonable. (Civ. Code, § 1654; see *Pacific Lbr. Co. v. Ind. Acc. Com., supra,* 22 Cal.2d at p. 422.) Here, although plaintiff's interpretation may not be *compelled*, it is not unreasonable. This is particularly so when one recalls that day pass users do not sign a release. Based on this evidence, a jury could go either way on the true meaning of the season pass.

We conclude that defendant did not carry its burden to show that under no theory can plaintiff avoid the release. More properly stated, defendant did not demonstrate that the release necessarily applies to this claim. Therefore the trial court should not have granted summary judgment on this basis.

## II. *Assumption of the Risk.*

The trial court also ruled the undisputed facts showed defendant owed no duty to take steps to prevent this accident. We agree that falling down is an inherent risk of skiing, and that a resort has no duty to eliminate or mitigate the inherent risks of skiing, lest the thrill of the sport be sapped. (See *Van Dyke v. S.K.I. Ltd.* (1998) 67 Cal.App.4th 1310, 1315 [79 Cal.Rptr.2d 775].)

But a resort cannot increase the risks associated with skiing without incurring a duty of care toward its patrons. (See *Knight v. Jewett* (1992) 3 Cal.4th 296, 315-316 [11 Cal.Rptr.2d 2, 834 P.2d 696] [duty "not to expose skiers to an increased risk of harm"].)

This does not mean a resort may not alter the natural features, such as by cutting trees, building supports for ski lifts, grooming the snow, or even

adding man-made snow to the slopes. Even if a ski lift tower may present a hazard to an errant skier, erection of such tower does not ordinarily increase the risks *inherent in skiing* and thereby cause the resort to acquire a duty of care toward a skier. (See *Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 12-14 [45 Cal.Rptr.2d 855] (*Connelly*).)

Defendant does not dispute it built a series of jumps in order to facilitate a race event it had scheduled for later the day of the accident. It argues jumps are part of the inherent thrill of skiing and therefore it acquired no duty of care to plaintiff by building jumps. This claim has superficial appeal, but fails on the facts of this case. Viewing plaintiff's evidence in the most favorable light, we conclude plaintiff produced facts from which a jury could find that defendant increased the risk of harm to skiers beyond those inherent in the sport.

The first question is one of scope or focus of the activity, viz., what sport are we talking about? For example, one must ride a horse in dressage, barrel racing and the Kentucky Derby, and falling off a horse is an inherent risk of horseback riding. But if a person put a barrel in the middle of the Churchill Downs racetrack, causing a collision and fall, we would not say that person owed no duty to the injured riders, because falling is an inherent risk of horseback riding.

Plaintiff produced evidence from which a jury could conclude he simply wanted to ski down the mountain. He was not a racing contestant and had no plans to participate in the racing or the race jumping. In effect, a jury could find that ordinary skiing is not the same sport as *ski racing*.

Although defendant disputes the facts, plaintiff produced evidence from which a jury could find that defendant failed to mark off the race start area (with the jumps) before the accident, and that an ordinary skier would not expect to encounter such jumps in that location. In fact, there was evidence plaintiff had skied that exact run the previous Thursday (three days before), but the landscape had been radically altered since then by the construction of the jumps.

We agree with defendant that skiers, particularly experts such as plaintiff, are or should be aware that slopes change, either by natural forces or by man, and that skiers must ski with vigilance, alert to unexpected dangers. That is part of the sport. Skiing on groomed, gentle runs would be boring once a person mustered the ability to control himself. As former Presiding Justice Robert K. Puglia observed in a similar context, "It is the thrill of challenging nature and running the rapids without mishap which gives the

sport [of river rafting] its distinct allure and sets it apart from, for example, a trip down the giant slide at Waterworld." (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 256 [38 Cal.Rptr.2d 65] (*Ferrari*).)

But when a resort turns part of a previously ordinary run into a significantly more dangerous racing area, it has a duty to warn its patrons. Put another way, defendant did not demonstrate that under no hypothesis can plaintiff prove defendant *did* increase the inherent risks of skiing by construction of the unmarked race start area on the ski run. Were this altered area not adequately marked as such, plaintiff cannot be faulted for entering it. Defendant has not shown that warning skiers that a race course start exists, so they may choose to avoid it, will tend to lessen the thrill of ordinary skiing. (See *Van Dyke v. S.K.I. Ltd., supra,* 67 Cal.App.4th at p. 1317.) Nor does this conclusion mean a resort has to mark every tree, bump and terrain feature on the mountain. Indeed, apart from the disagreeable visual clutter, such signage itself would deter vigorous skiing. But defendant has not shown that plaintiff cannot prove the alterations resulting in the jumps at the race start were so profound and unforeseeable that a duty to warn arose.

Ski runs are commonly rated by level of difficulty, as an exhibit in this case reflects is done at defendant's resort. (See *Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 208 [105 Cal.Rptr.2d 600] (*Kane*) ["two black diamonds"]; see also *Ferrari, supra,* 32 Cal.App.4th 248, 254 [rapids generally rated for rafters].) We do not imply that a temporary variation which makes a slope more difficult, would of itself support liability. But if defendant constructed a huge pit on a bunny slope which was invisible to skiers until it was too late, that could result in liability. Whether this case approaches such scenario sufficiently to create a duty to warn is for the jury to decide. Inducing a sports participant to exceed his or her abilities may generate a duty. (*Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817, 823 [20 Cal.Rptr.2d 270]; *Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 753-756 [33 Cal.Rptr.2d 732].) But ordinarily challenging a student to try a more difficult maneuver, for example, will not. (*Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 532-534 [50 Cal.Rptr.2d 671].) The question in such cases is whether an instructor increased the risks beyond those inherent in the sport. (*Kane, supra,* 88 Cal.App.4th at p. 212.) Where, as here, the facts are in dispute about the existence of a warning, the question is for the jury.

Defendant produced evidence it *did* warn plaintiff, by erecting a line of colored bamboo poles, which are commonly used to mark off ski areas. If the hazard was plainly visible, defendant may not be liable. (See *Connelly, supra,* 39 Cal.App.4th at pp. 13-14.) Similarly, if plaintiff deliberately

skied toward the more dangerous area, defendant may not be liable. (See *O'Donoghue v. Bear Mountain Ski Resort* (1994) 30 Cal.App.4th 188, 193 [35 Cal.Rptr.2d 467].) But the evidence is in conflict, therefore summary judgment is inappropriate.

## DISPOSITION

The judgment is reversed with directions to vacate the order granting summary judgment and enter an order denying the motion. Defendant is to pay plaintiff's costs of this appeal.

Sims, Acting P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied January 7, 2002.

APPENDIX

# SEASON PASS & LIABILITY RELEASE AGREEMENT·
### PLEASE READ CAREFULLY BEFORE SIGNING

*Initial at the appropriate season pass.*

**Full Season Pass** - This pass is nontransferable. Use by other than the actual passholder will result in forfeiture of the pass. Pass must be in passholder's possession during use.

**Midweek Season Pass** - This pass is nontransferable. Use by other than the actual passholder will result in forfeiture of the pass. Pass must be in passholder's possession during use. Pass is only valid Monday through Friday, with the exception of the following Holiday dates: 11/26-11/27, 12/28-12/31, 1998: 1/1, 1/19 and 2/15, 1999.

**Midweek Plus Season Pass** - This pass is nontransferable. Use by other than the actual passholder will result in forfeiture of the pass. Pass must be in passholder's possession during use. Pass is valid every day of the week except Saturdays.

**Cross Country Season Pass** - This pass is nontransferable. Use by other than the actual passholder will result in forfeiture of the pass. Pass must be in passholder's possession during use and is not valid on chairlifts.

**Employee Season Pass** - This pass is nontransferable. Use by other than the actual passholder will result in forfeiture of the pass. Pass must be in passholder's possession during use. This pass must be surrendered upon termination of employment.

For Office Use Only
Last Name: Solis, M
Date Printed: 10/27/98
Pass#: 1035/0-93
Picked-up:

## LIABILITY RELEASE

I understand that the sports of skiing, snowboarding, and other recreational activities involve inherent and other risks of INJURY and DEATH. I voluntarily agree to expressly assume all risks of injury or death that may result from skiing, snowboarding, or any other activity at Kirkwood Resort Company.

I AGREE TO RELEASE Kirkwood Associates, Inc., d.b.a. Kirkwood Resort Company, its ski shop, snowboard shop, employees, owners, affiliates, agents, landowners, officers, directors (collectively 'PROVIDERS'), from all liability for injury, death, and property loss and damage that results from the passholder's participation in the sport of skiing, snowboarding, or any other activity at Kirkwood Resort Company including all liability which results from the NEGLIGENCE of PROVIDERS, or any other person or cause.

I further agree to defend and indemnify PROVIDERS for any loss or damage arising from claims or lawsuits for personal injury, death, and property loss and damage related to participation in the sport of skiing, snowboarding, or any other activity at Kirkwood Resort Company.

I acknowledge this agreement is governed by the applicable laws of the State of California. I further agree that any action involving parties or issues relating to or arising out of this agreement must be instituted and prosecuted in the courts in Alpine County, California. If any provision of this agreement is determined to be unenforceable, all other provisions shall be given full force and effect.

I HAVE READ, UNDERSTAND, AND VOLUNTARILY AGREE TO THIS AGREEMENT AND RELEASE OF LIABILITY.

Passholder's Signature: *Marvin A. Solis*      Date: 9-4-98

Parent/Guardian: If passholder is a minor, I verify that I am the parent or guardian of the minor, and I have authority to enter into this agreement on behalf of the passholder.

Parent/Guardian's Signature: _____ Date: _____

### FORGOTTEN AND LOST SEASON PASS POLICY
If you forget to bring your pass, you will be granted a discounted ticket at the HALF-DAY RATE on a one-time basis only. Repeat violators will be charged full rate. If you lose your pass, you may replace it for $50.

Passholder's Initials: _____ Date: 9-4-98

# PLEASE READ CAREFULLY

## SKIER/SNOWBOARDER SAFETY & RESPONSIBILITY CODE

I understand that skier/snowboarder safety is an important concern in our sport. As an express condition of pass usage, I agree to abide by the following rules of conduct:

- Always stay in control, and be able to stop or avoid other people or objects.
- People ahead of you have the right of way. It's your responsibility to avoid them.
- You must not stop where you obstruct a trail, or are not visible from above.
- Whenever starting downhill or merging into a trail, look uphill and yield to others.
- Always use devices to help prevent runaway equipment.
- Observe all posted signs and warnings. Keep off closed trails and out of closed areas.
- Portions of the mountain may be closed for safety and other reasons from time to time. Obey the closure signs.
- The "tuck" position is not safe technique and is expressly prohibited
- If you collide with another skier/snowboarder, do not leave the accident scene.
- Prior to using any lift, you must have the knowledge and ability to load, ride and unload safely.
- A passenger shall get on and off a lift only at the designated area.

*This is a partial list. Be safety conscious! Be aware...ski with care.*

**WARNING:** *A passenger who uses a lift shall be presumed to have sufficient ability or physical dexterity to negotiate the lift. Each passenger shall maintain control of speed and course as the passenger loads or unloads the lift. A passenger shall get on and off a lift only at the designated area. No passenger shall embark without first understanding proper loading, riding and unloading procedures.*

## OUT OF BOUNDS SKIING POLICY

I understand that certain areas of Kirkwood are closed from time to time for skier/snowboarder safety. Signs are posted to make skiers/snowboarders aware of these closures.

It is unlawful to ski/snowboard within a closed area. I understand that failure to comply with this law may result in my arrest. My pass may be revoked for skiing out of bounds. The minimum penalty is a two-week suspension.

It is my responsibility to be aware of closed areas. I understand that no excuse will be accepted for skiing/snowboarding in closed areas. I agree to surrender my pass to Ski Patrol upon demand if I violate these provisions.

## ZERO-TOLERANCE BEHAVIOR POLICY

Kirkwood is adopting a policy of zero tolerance toward guests who use drugs on Kirkwood property, use foul language around other guests, verbally or physically abuse Kirkwood employees, or violate certain rules pertaining to on-premise dogs. This policy shall apply to all season passholders and day ticket users.

Illegal **DRUG USE** by Kirkwood Ski Resort guests is not only a violation of the law, but is also extremely offensive to our employees and other guests. Drug use on Kirkwood Ski Resort property and its facilities will not be tolerated. **FOUL LANGUAGE AND PHYSICAL OR VERBAL ABUSE** of Kirkwood employees also will not be tolerated. Guests who violate these principles of common decency will be removed from the premises, forfeit their season pass for at least two weeks, and/or be subject to arrest. Repeat violators will lose their ski pass for the season.

**UNLEASHED DOGS** will not be permitted on Kirkwood property or facilities. **DOGS LEFT TIED** to parked vehicles are permitted **ONLY** in the Lower Snowkirk Parking Lot, located just beyond the Red Cliffs Day Lodge. Leashes must be long enough to prevent dogs from straying into traffic or interfering with other guests. Violators of the dog policy will be subject to forfeiture of their ski pass for two weeks.

Kirkwood's Zero-Tolerance Behavior Policy has been adopted only to make the ski experience at Kirkwood as enjoyable as possible for all of our guests. Your cooperation is appreciated.

**TRANSPORTATION:** *Please be advised that while Kirkwood maintains a shuttle service during the ski season for guests of select lodging properties, we are unable to provide this service to our passholders. Kirkwood passholders are responsible for their own transportation to and from the resort.*

I, _MARIO A. SOLIS_ , agree to abide, and I shall willingly relinquish my ski pass to Kirkwood personnel for violating these rules.

Signature: _Mario A. Solis_          Date: _9-4-98_