Filed 5/19/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| URIEL JIMENEZ, a Minor, etc., et al., | C075366 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV 0030672) |
| v. | |
| ROSEVILLE CITY SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Placer County, Michael A. Jacques, Court Commissioner. Reversed with directions.

Rhoads Appellate Group, Steven R. Rhoads; Scarlett Law Group and Randall H. Scarlett for Defendant and Appellant.

Evans, Wieckowski, Ward & Scoffield and Carol A. Wieckowski for Plaintiff and Respondent.

1

Plaintiff Uriel Jimenez (Jimenez) was injured at a middle school within defendant Roseville City School District (District). The 14-year old Jimenez was in a classroom where fellow middle school students were purportedly practicing break dancing, but in which some were also performing "flips." This violated school rules in two ways: first, students had been ordered not to perform flips; second, the teacher who allowed the students to use his classroom for dancing violated school policy by leaving them unsupervised. Jimenez was seriously injured when other students waited for the teacher to leave them unsupervised, and then induced Jimenez to attempt a flip. The trial court granted the District summary judgment, concluding Jimenez assumed the risk of injury by participating in break dancing.

As we will explain, viewing the evidence in the light most favorable to Jimenez, we find two viable theories of liability. Accordingly, we shall reverse and remand with directions to the trial court to deny the District's summary judgment motion.

## BACKGROUND

The briefing agrees on most of the relevant facts. (See *Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175, fn. 3 [summary judgment case; "where the parties agree, we accept their agreed facts as mutual concessions"].)

The operative complaint alleged negligence and negligent supervision. The answer partly raised assumption of the risk. The summary judgment motion raised assumption of the risk and a defense based on a signed release.[1]

The District's supporting evidence included deposition excerpts as follows.

Student Paul Jackson testified students break danced before school, including doing flips, and that Alan Hall, a District teacher, then gave the students a place to practice in order to participate in a talent show. Flips had been witnessed by school

---

[1] The release defense was not pleaded in the answer, was not relied on by the trial court, and is not briefed on appeal, therefore we discuss it no further.

officials and had not been forbidden by Assistant Principal Gutierrez. The students practiced in Hall's classroom before school started. Jacob Simmons flipped Jackson when Hall was outside the room, then flipped Jimenez, who was injured as a result. Jimenez was hesitant about flipping, but did not actively protest. Hall gave no instructions about flipping.

Simmons testified that flips are part of break dancing. Gutierrez never told them not to flip off a stage. Hall later invited the boys to use his classroom to dance, "maybe" three weeks before the incident. Hall never forbade flips. Jimenez was "iffy" about learning to flip but agreed to try to flip at a time when Hall was not in the classroom, and Jimenez was then injured.

Jimenez testified he had been to four other dance rehearsals in Hall's class, but none in other places before he was hurt. However, he had seen the other boys practicing on an outside stage before, and saw Jackson do back flips more than once before. Gutierrez had been present when Jackson was flipping on the stage, but did not tell Jackson to stop flipping. On the day in question, Hall had left the class without saying anything to the boys, and then Jackson and Simmons did flips. Jimenez has no memory of how he became injured.

Julius Larion testified a group had been practicing a dance routine for a talent show for about a week. Jimenez "wanted to . . . learn how to dance." Before Hall's room was used, the boys had used the gym, and did flips. Jimenez could not dance and had never tried to flip before.

Zachary Farr testified Simmons grabbed Jimenez's arm, and Jimenez protested, saying "no, no, no" and Simmons flipped Jimenez.

In opposition, Jimenez in part presented the following evidence:

3

Daniel Etcheto, a break dancing expert, described break dancing in some detail. In short, he opined ordinary break dancing did *not* involve flips, but that some break dancers with gymnastic or Capoeira ability or experience may incorporate flips into their dancing. We discuss his declaration more fully *post*.

Richard Swanson, a school administration expert, testified that Hall violated supervisory norms by leaving the students unsupervised in violation of District policy, and by not giving the students "instruction about ground rules for their practice which would specifically mention prohibitions on risky behavior." Hall's actions were "totally outside the range of ordinary activity involved in a teacher's role for a dance class or activity."

Hall testified he was a computer and math teacher. He also coached cross country and track. Simmons asked Hall if they could practice break dancing for an upcoming talent show in his classroom, and Hall had the boys fill out the requisite release forms. Hall has no formal training at break dancing, had minimal experience with it from when he was a seventh-grader, and all he did as far as a demonstration for the students was to spin on his back and jump up, and perform a robotic move associated with Michael Jackson. He did not tell the principal or vice principal that he was allowing students to use his classroom before school hours because "[i]t didn't seem necessary." He regularly left the classroom for short periods of time during the practice sessions, to make copies, use the bathroom, or make a telephone call. He did not tell the students to stop their activity when he was gone, because "[i]t didn't seem necessary." He had not been aware of any school rule requiring him to be present all the time or any school rule prohibiting flips, and he had not known flips were being done, nor did he know that flips were part of break dancing. He had left for the bathroom at the time Jimenez was injured.

Assistant Principal Pablo Gutierrez testified he did not know what was happening in Hall's classroom before the accident, and school policy dictated that there should have been supervision at all times, and that if a teacher left such a classroom, another teacher

4

should have been supervising, or the students should have been instructed to stop their activity until their teacher returned. Before Jimenez's injury, Gutierrez had seen a student--part of a group that included Simmons and Jackson--flipping near a stage and he told that student to stop and said he did not want to see " 'anybody trying' " to flip; when the students moved to a grassy area, he again told them not to flip. On at least one of four occasions where he made such admonishments, Jimenez was present, though Jimenez had not been flipping. In Gutierrez's opinion, Hall should not have left for the bathroom without telling the students to stop their activity and without finding another teacher to supervise them in his absence. He did not associate break dancing with flipping; in his view: "[R]emember, there are two things here. Break dancing is totally different from what I have in mind of flipping."

The trial court found it was undisputed that break dancing "can involve flips," Jimenez assumed the risk of injury from such flips by voluntarily break dancing, and the District had no duty to protect Jimenez from the inherent risks of break dancing. Jimenez timely appealed from the ensuing judgment.

## DISCUSSION

### I

### *Standard of Review*

We have recently restated the applicable standard of review in summary judgment appeals by plaintiffs as follows: " 'We review the trial court's grant of summary judgment de novo. [Citation.] We consider all the evidence offered in connection with the motion, except that which the trial court properly excluded. [Citation.] In conducting our de novo review, we must view the evidence in a light favorable to plaintiffs, liberally construing their evidentiary submission while strictly scrutinizing defendant's showing, and resolving any evidentiary doubts or ambiguities in plaintiffs' favor.' " (*Leber v. DKD of Davis, Inc*. (2015) 237 Cal.App.4th 402, 406; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

5

## II

### *Assumption of the Risk Generally*

Before addressing Jimenez's claims, we briefly describe assumption of risk.

"Primary assumption of risk is a complete bar to recovery. It applies when, as a matter of law, the defendant owes no duty to guard against a particular risk of harm. Secondary assumption of risk applies when the defendant does owe a duty, but the plaintiff has knowingly encountered a risk of injury caused by the defendant's breach. Liability in such cases is adjudicated under the rules of comparative negligence." (*Gregory v. Cott* (2014) 59 Cal.4th 996, 1001.) "Secondary assumption of risk . . . is predicated on the existence of a duty. 'The first question is whether the defendant has breached a duty to the plaintiff. The duty analysis depends on the nature of the activity . . . and the parties' relationship to it.' " (*Id.* at p. 1007; see *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 178.)

> "Primary assumption of risk occurs where a plaintiff voluntarily participates in a sporting event or activity involving certain inherent risks. For example, an errantly thrown ball in baseball or a carelessly extended elbow in basketball are considered inherent risks of those respective sports. [Citation.] Primary assumption of risk is a complete bar to recovery. [Citation.]

> "Primary assumption of risk is merely another way of saying no duty of care is owed as to risks inherent in a given sport or activity. The overriding consideration in the application of this principle is to avoid imposing a duty which might chill vigorous participation in the sport and thereby alter its fundamental nature." (*Wattenbarger v. Cincinnati Reds, Inc*. (1994) 28 Cal.App.4th 746, 751-752.)

Although the doctrine is often applied as between sports coparticipants, it defines the duty owed as between persons engaged in any activity involving inherent risks. (See, e.g., *Nemarnik v. Los Angeles Kings Hockey Club* (2002) 103 Cal.App.4th 631 [arena owners and spectators]; *Lilley v. Elk Grove Unified School Dist.* (1998) 68 Cal.App.4th 939, 943-946 [students and instructors] (*Lilley*); *Staten v. Superior Court* (1996) 45

Cal.App.4th 1628, 1633-1634 [figure skaters] (*Staten*).) The doctrine applies to activity "done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury" (*Record v. Reason* (1999) 73 Cal.App.4th 472, 482) or involves "an inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity" (*Beninati v. Black Rock City, LLC* (2009) 175 Cal.App.4th 650, 658 [plaintiff burned by remnants of Burning Man effigy]).

With this overview of assumption of the risk, we now analyze Jimenez's claims.

III

*Analysis*

It may be helpful to describe what this case is not about. It is not about the possible liability of coparticipants in a recreational activity. It is not about the possible liability of an instructor of a recreational activity towards a student. It is about the possible liability of a school because a teacher broke school rules and allowed middle-school students to engage in a potentially risky activity, break dancing, in his classroom without supervision. Further, there was some evidence that school authorities (i.e., Assistant Principal Gutierrez) had not informed Hall that some of those students had recently been seen flipping, and had been forbidden to flip at the school.

As we explain, the District had a duty to supervise students engaged in a potentially dangerous activity. Jimenez is not suing a coparticipant for hurting him, or suing on the theory that the teacher misadvised him about how or whether to do a flip. He is suing because he was under the care of the District, on District premises, when at least one District employee knew or should have known students were "flipping" in violation of the rules, but Jimenez was left entirely unsupervised. A jury could find this lack of supervision proximately caused Jimenez's injuries.

Further, even if the jury rejected the above theory of liability, there is a triable issue of fact about whether the District, by neglect, increased the risks of harm to

7

Jimenez. The trial court found it was undisputed that break dancing included flips, citing to Jimenez's break dancing expert's declaration about the nature of break dancing. However, when we read that declaration in the light most favorable to Jimenez, it shows that flips are *not* an integral part of ordinary break dancing. The expert described two essentially different activities that may fall under the rubric of "break dancing," but which have different inherent risks. A jury could find that the District did not take adequate steps to disseminate and enforce the "no flip" policy Gutierrez allegedly instituted, and that this failure increased the inherent risks of ordinary break dancing, causing Jimenez's injuries.[2]

A. *Evidence of negligent supervision*.

Viewing the facts in the light most favorable to Jimenez--as we must in this appeal (see *Aguilar*, *supra*, 25 Cal.4th at p. 843)--the record shows that Hall allowed students to break dance in his classroom without any supervision for periods of time (in violation of school policy) and that during such a period of non-supervision, Jimenez was injured. Had the school properly communicated or enforced the rules about supervision, Hall either would not have left the boys unsupervised or at the very least would have directed them to stop dancing until he returned. A jury could find this lack of supervision breached a duty of care owed to Jimenez and was a proximate cause of his injuries. The fact Jimenez chose to flip at the behest of his fellow students does not preclude liability of the District, although it may trigger secondary assumption of risk, requiring application of comparative negligence principles by the jury.

---

[2] We bypass the strict summary judgment paradigm which would normally involve first determining if the District had met its initial prima facie case to show no duty, and then determining whether Jimenez's showing overcame that prima facie case. The briefing only cursorily references the paradigm; for the most part, the parties on appeal and the trial court also bypassed it to focus directly on the duty question.

The relationship of a landowner to a person injured on the premises is generally limited to providing a reasonably safe facility that does not increase the inherent risks of the activity engaged in on the property. (See *Morgan v. Fuji Country USA, Inc*. (1995) 34 Cal.App.4th 127, 134 [golf course owner has duty to "provide a reasonably safe golf course" and " 'minimize the risks without altering the nature of' " golf]; *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 364-367 (*Solis*) [fact issue existed as to whether ski resort altered the ski run so as increase the inherent risks of ordinary downhill skiing]; *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248*,* 254-255 (*Ferrari*).)

But as for schools for minor children, the case of *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741 (*Dailey*), although predating the modern understanding of assumption of the risk, is instructive. A high school student began to " 'slap fight' or 'slap box' " with another student on the playground near the gymnasium during lunch, an activity designed to show "speed and agility rather than to inflict physical injury," but after several minutes the plaintiff fell backwards, fracturing his skull. (*Id*. at pp. 745-746.) Officials testified there was no formal supervision for that area of the school, although it was the responsibility of the physical education department. (*Id*. at pp. 746, 749-750.) A physical education instructor in the gymnasium office testified he knew his department was responsible for supervising the area, but there was "no set procedure" for assigning supervision and he was not watching it. (*Id*. at pp. 746, 750.) "He concurred with [the department chair] that while slap boxing was a normal activity for male high school students, it could lead to 'something dangerous.' He testified that initially friendly slap boxing could escalate into actual fighting and that when he observed students engaging in it he would order them to stop immediately." (*Ibid*.)

9

The California Supreme Court analyzed the duty question as follows:

"While school districts and their employees have never been considered insurers of the physical safety of students, California law has long imposed on school authorities a duty to 'supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection. [Citations.]' [Citations.] The standard of care imposed upon school personnel in carrying out this duty to supervise is identical to that required in the performance of their other duties. This uniform standard to which they are held is that degree of care 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances.' [Citations.] *Either a total lack of supervision [citation] or ineffective supervision [citation] may constitute a lack of ordinary care on the part of those responsible for student supervision.* Under section 815.2, subdivision (a) of the Government Code, a school district is vicariously liable for injuries proximately caused by such negligence." (*Dailey*, *supra*, 2 Cal.3d at p. 747, italics added.)

Our Supreme Court continued:

"The fact that [plaintiff's] injuries and death were sustained as a result of boisterous behavior engaged in by him and a fellow student does not preclude a finding of negligence. Supervision during recess and lunch periods is required, in part, so that discipline may be maintained and student conduct regulated. Such regulation is necessary precisely because of the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm. High school students may appear to be generally less hyperactive and more capable of self-control than grammar school children. Consequently, less rigorous and intrusive methods of supervision may be required. Nevertheless, *adolescent high school students are not adults and should not be expected to exhibit that degree of discretion, judgment, and concern for the safety of themselves and others which we associate with full maturity*. As the court observed in *Satariano v. Sleight* (1942) 54 Cal.App.2d 278, 283: '[W]e should not close our eyes to the fact that . . . boys of seventeen and eighteen years of age, particularly in groups where the herd instinct and competitive spirit tend naturally to relax vigilance, are not accustomed to exercise the same amount of care for their own safety as persons of more mature years.' Recognizing that a principal task of supervisors is to anticipate and curb rash student behavior, our courts have often held that a failure to prevent injuries caused by the intentional or reckless conduct of the victim or a fellow student may constitute negligence." (*Dailey*, *supra*, 2 Cal.3d at pp. 748-749, italics added, fn. omitted; see *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869-871 [reaffirming *Dailey* rule].)

This duty analysis regarding negligent supervision has survived the changes in the law of assumption of the risk. For example, in *Lucas v. Fresno Unified School Dist.* (1993) 14 Cal.App.4th 866, accepting the facts as true for purposes of summary judgment, a 10-year-old student joined with other students in throwing dirt clods at one another, although he knew he was not supposed to do this. (*Id.* at p. 868.) The court found a duty of supervision was breached, based on Education Code section 44807[3] and related authority (including *Dailey*).[4] (*Id.* at pp. 871-873; see *J.H. v. Los Angeles Unified School Dist.* (2010) 183 Cal.App.4th 123, 146-148 [assumption of risk did not bar student's claim based on negligent supervision].) "Under the duty analysis, the case falls within the secondary assumption of risk category--the District owed a duty of care to [the student], who proceeded to encounter a known risk occasioned by the Districts' breach of that duty." (*Lucas*, at pp. 872-873, italics added.) Thus, because primary assumption of the risk did not apply, there was no complete bar to recovery, only the potential application of comparative fault and apportionment of loss by the jury.

In a case involving an *adult* student, we also held that a student's participation in a school activity did not necessarily trigger primary assumption of the risk. In *Patterson v. Sacramento City Unified School Dist.* (2007) 155 Cal.App.4th 821 (*Patterson*), unsupervised adults taking a truck driving course unsafely loaded a flatbed trailer in such

---

[3] Undesignated statutory references are to the Education Code.

[4] Section 44807 provides in part: "Every teacher in the public schools shall hold pupils to a strict account for their conduct on the way to and from school, on the playgrounds, or during recess. A teacher, vice principal, principal, or any other certificated employee of a school district, shall not be subject to criminal prosecution or criminal penalties for the exercise, during the performance of his duties, of the same degree of physical control over a pupil that a parent would be legally privileged to exercise but which in no event shall exceed the amount of physical control reasonably necessary to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning."

11

a way as to push the plaintiff--a fellow student--off the bed of the trailer. (*Id.* at pp. 825-826.) We first found a duty of care based on certain Education Code provisions applicable to community colleges as well as the classic common-law test for duty set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108. (*Patterson*, at pp. 829-833.)[5]

Then, we explained that the defense of assumption of the risk had been extended from sports to other activities "where the activity is inherently dangerous." (*Patterson*, *supra*, 155 Cal.App.4th at p. 839.) We concluded loading a trailer was not such an activity. (*Id.* at pp. 840-841.) We also observed that, "What the instructors allegedly did—or did not do—in the present case is conduct that we want to chill. As a matter of policy, we do not want truck driver training instructors to send inexperienced students out to load flatbed trailers without instruction and supervision." (*Id.* at pp. 841-842.)

Following the reasoning of *Lucas* and *Patterson*, we do not want schools to allow children--particularly children less mature than those in *Dailey*--to congregate in unsupervised classrooms to engage in physical activities that can easily spiral into dangerous activities, given the known proclivities of children to engage in horseplay, etc. Indeed, both Assistant Principal Gutierrez and Jimenez's school administration expert Swanson testified constant vigilance should have been maintained, or the boys should have been told to stop all activity until Hall returned. However, Hall testified he did not think it was necessary to tell the school administration he had opened his classroom for early-morning physical activity and he did not think it was necessary to supervise the

---

[5] For purposes of finding a duty in the ordinary negligence case, "the major [considerations] are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian*, *supra*, 69 Cal.2d at page 113.)

children at all times or tell them to stop their activity until he returned, arguably reflecting a failure of proper training of teachers by the school authorities.

Accordingly, as Jimenez has argued, to the extent his complaint pleads negligent supervision, he has evidence to support such a claim, and this portion of his case is not barred by primary assumption of the risk.

In concluding otherwise, the trial court largely relied on a prior decision of this court, *Lilley*, *supra*, 68 Cal.App.4th 939. But in doing so, the trial court overlooked differences between the relationship between the parties in that case and the relationship of the parties in this case. Lilley was a middle school student who was injured while participating in an after-school wrestling program and sued the school and coach. (*Id*. at p. 942.) We held assumption of the risk applied because wrestling was an activity involving an inherent risk of injury and it would change the nature of the activity to preclude coaches from pushing students " 'to stretch, and thus to learn.' " (*Id*. at pp. 943-944.) That is not a controversial point. But we then rejected a theory proposed by Lilley that would eliminate assumption of the risk in *all* cases involving minor students. Pointing to section 44807, which generally provides a duty to supervise school children, Lilley argued assumption of the risk was not applicable to his case. (*Id*. at pp. 944-945.) We rejected this view:

> "Section 44807 imposes on school authorities a general duty to supervise pupils on school property during school hours in order to ' "regulate their conduct so as to prevent disorderly and dangerous practices which are likely to result in physical injury to immature scholars under their custody." ' [Citations.]

> "The statute 'does not make school districts insurers of the safety of pupils at play or elsewhere' [citation], and, by its terms, section 44807 does not purport to impose a duty on teachers to insure students against the risks of injury inherent in the participation in extracurricular school sports.

13

"If the Legislature wanted to do so, it would be a simple, linguistic task to abrogate primary assumption of the risk with respect to school children engaged in extracurricular sports activities. The Legislature has not chosen to do so expressly. Nevertheless, plaintiff would have this court reach that result through extension of the general duty of supervision set forth in section 44807.

"*We decline to construe the general duty of supervision embodied in section 44807 to foreclose application of the primary assumption of the risk doctrine to those risks inherent in school sports*. Nothing in the statute evinces an intent to modify common law assumption of the risk principles. [Citation.] Moreover, the policy factors governing primary assumption of the risk in a general sports setting apply equally to students participating in extracurricular school sports. [Citations.] Imposition of a duty to protect student athletes from any risk inherent in a sport like wrestling would fundamentally alter the nature of the sport and, in some instances, effectively preclude participation altogether because the threat of liability would make schools reluctant to offer sports as an extracurricular activity." (*Lilley*, *supra*, 68 Cal.App.4th at pp. 945-946, italics added.)

We adhere to our holding in *Lilley*. However, just as section 44807 cannot be construed as undermining assumption of the risk in all cases involving school children, nothing in *Lilley* can be construed to eliminate the general duty of supervision in all cases involving children when it is *that* duty--and not the supposed duty of sports coparticipants to each other or the supposed duty of coaches to students--that provides a basis for liability. Here, Jimenez is suing on the theory that a group of middle-school students should not have been left unsupervised in a classroom with the knowledge that they would be dancing, particularly when some had been seen flipping on campus in the recent past and had been ordered to stop. A jury could find it was foreseeable that the District's employees tolerated a dangerous situation on its property and failed to ameliorate that danger by supervising the children. (See *Forgnone v. Salvador Union Elementary School Dist.* (1940) 41 Cal.App.2d 423, 425 (*Forgnone*) [supervision would have stopped behavior]; *M. W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 517-519 [compulsory nature of education, coupled with the propensity of children to misbehave, as well as § 44807, establish a duty to supervise]; see also

14

*Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1326-1327.)

Certainly, "Whenever gravity is at play with the human body, the risk of injury is inherent." (*Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112, 1114 (*Aaris*).) In *Aaris* the court applied primary assumption of the risk against a claim of inadequate supervision because a cheerleading coach "was supervising and training the cheerleaders. . . . Education Code section 44807 does not 'trump' the doctrine of primary assumption of risk where a high school cheerleader participates in cheerleading stunts as a class elective activity *and the activity is supervised by an experienced coach*." (*Aaris*, *supra*, 64 Cal.App.4th at pp. 1118-1119, italics added.) But again, here, at the relevant time, *no* supervisor was in the classroom when the injury occurred.

Accordingly, we agree with Jimenez that, viewing the evidence in his favor, his theory of negligent supervision survives the District's summary judgment motion.

B. *Increasing the inherent risks of the activity*.

Even if a jury found Hall's absence from the classroom was too brief to violate the District's duty of supervision, it could find that by not properly disseminating and clearly enforcing the alleged school policy against flips, the District increased the inherent risks of break dancing. Although the trial court found both that the question of inherent risks was purely legal and that it was "undisputed" that break dancing involves flips, we disagree on both points.

Admittedly, it is sometimes said that "[t]he existence and scope of a defendant's duty of care in the primary assumption of risk context 'is a *legal* question which depends on the nature of the sport or activity . . . and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury.' " (*Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 11-12; see *Lilley*, *supra*, 68 Cal.App.4th at p. 943; *Staten*, *supra*, 45 Cal.App.4th at p. 1635.) This statement of the

rule is correct where there is no dispute about the inherent risks, and such cases may be resolved on summary judgment. (See, e.g., *Ferrari, supra,* 32 Cal.App.4th 248.)

However this statement is overly broad. Although the risks inherent in *many* activities are not subject to reasonable dispute (e.g., being hit with a baseball during a game), the risks inherent in *some* activities are not commonly known. In such cases, expert testimony may be required " 'for purposes of weighing whether the inherent risks of the activity were increased by the defendant's conduct.' " (*Kahn v. East Side Union High School* Dist. (2003) 31 Cal.4th 990, 1017, quoting *Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 995, fn. 23; see also *Staten*, *supra*, 45 Cal.App.4th at pp. 1635-1636.) As stated by our Supreme Court, "Judges deciding inherent risk questions . . . may consider not only their own or common experience with the recreational activity involved but may also consult case law, other published materials, *and documentary evidence introduced by the parties* on a motion for summary judgment." (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1158, italics added; see *Gregory v. Cott*, *supra*, 59 Cal.4th at p. 1006, fn. 6.) Thus, it is not entirely accurate to say inherent risks of an activity always present purely legal questions, because sometimes the nature of an activity and its risks must be gleaned from the evidence.

The trial court based its finding that break dancing necessarily encompasses flips on Jimenez's own expert's declaration. However, a jury *could* rationally interpret the declaration otherwise. Viewed in the light most favorable to Jimenez, a jury could find that Etcheto's declaration showed there are two distinct activities. The first activity, for lack of a better term, we will call ordinary break dancing; the second is an extreme form of break dancing that sometimes includes flips, which are not integral to ordinary break dancing and require specialized training and equipment.

Etcheto had a degree in mechanical engineering, was an experienced break dancer, and had taught break dancing for about 15 years. Paragraph 11 of Etcheto's declaration, repeatedly cited by the trial court, stated as follows:

16

"Breakdancing can be performed and is performed without the use of any flips. *Flips are not part of the essential character of breakdancing.* Flipping is an advanced move borrowed from gymnastics and Capoeira that has been incorporated into breakdancing by those that have these advanced gymnastic abilities (a small minority of breakdancers) to set themselves apart from lesser skilled dancers and expand their repertoire of moves. Not all breakdancers have access to facilities to learn flips, such as a gymnastics facility. For example, most Europeans learn acrobatics from gymnastic training in gymnastic facilities while Brazilians typically learn on soft sand under [Capoeira] Mestres (Instructors). Flips are a high risk move, dangerous and not always able to be performed due to low ceilings or inadequate space therefore breakdancers do not rely on them heavily even if they have the advanced gymnastics abilities to perform them. You do not have to be able to flip to breakdance, there are many top breakdancers that do not incorporate any style of flips in their routines. *The vast majority of breakdancers do not do flips as they do require advanced gymnastic abilities and they are dangerous to perform.*" (Italics added.)

It is difficult to read this paragraph of Etcheto's declaration to mean that ordinary break dancing necessarily involves flips, when the text and tenor is to the contrary.

This is made even clearer by two later portions of Etcheto's declaration. Paragraph 16 provided in part: "Having a beginner learn flips on a hard floor with no qualified instructor present, and no instruction and supervision being given, would be contrary to established procedure and outside the range of ordinary activity involved in teaching breakdancing." Paragraph 17 provided in full: "Having breakdancing without flipping would not alter the fundamental nature of breakdancing. Breakdancing without flipping is common and normal. The primary purpose of breakdancing is to entertain and flips are not required to entertain."

Viewed in the light most favorable to Jimenez, we cannot agree with the trial court's interpretation of Etcheto's declaration, to conclude that flips necessarily are an integral part of or are an inherent risk of ordinary break dancing.

We accept that unwanted contact with the floor is an inherent risk of any kind of dancing, because as a matter of common experience any dancer may slip, or dancers may collide, causing a fall. (See *Aaris*, *supra*, 64 Cal.App.4th at p. 1114 [whenever "gravity is at play with the human body, the risk of injury is inherent"]; cf. *Bush v. Parents*

17

*Without Partners* (1993) 17 Cal.App.4th 322, 329 [grudgingly assuming for purposes of argument that falling is an inherent risk of recreational dancing].) But that does not mean every time a dancer contacts the floor, it is because of an inherent risk of dancing.

We previously addressed a similar point in a skiing accident case, where a ski run "had recently been altered to accommodate a ski race. This area now consisted of hazardous man-made jumps." (*Solis*, *supra*, 94 Cal.App.4th at p. 358.) In addressing assumption of the risk in that case, we held in part as follows:

> "Defendant does not dispute it built a series of jumps in order to facilitate a race event it had scheduled for later the day of the accident. It argues jumps are part of the inherent thrill of skiing and therefore it acquired no duty of care to plaintiff by building jumps. This claim has superficial appeal, but fails on the facts of this case. Viewing plaintiff's evidence in the most favorable light, we conclude plaintiff produced facts from which a jury could find that defendant increased the risk of harm to skiers beyond those inherent in the sport.

> "The first question is one of scope or focus of the activity, viz., what sport are we talking about? For example, one must ride a horse in dressage, barrel racing and the Kentucky Derby, and falling off a horse is an inherent risk of horseback riding. But if a person put a barrel in the middle of the Churchill Downs racetrack, causing a collision and fall, we would not say that person owed no duty to the injured riders, because falling is an inherent risk of horseback riding.

> "Plaintiff produced evidence from which a jury could conclude he simply wanted to ski down the mountain. He was not a racing contestant and had no plans to participate in the racing or the race jumping. In effect, a jury could find that ordinary skiing is not the same sport as *ski racing*." (*Solis*, *supra*, 94 Cal.App.4th at p. 365.)

Similarly, Etcheto's declaration established that ordinary break dancing is not the same as break dancing incorporating gymnastic or Capoeira moves such as flipping, which requires special training and is not part of ordinary break dancing. He further opined that eliminating flips would not alter the fundamental nature of ordinary break dancing. To conclude that because *some* breakdancers do flips means that flips are inherent in *all forms* of break dancing reads Etcheto's declaration in favor of the movant

18

on summary judgment, contrary to the rule that the movant's evidence is to be construed strictly and the opponent's evidence is to be construed broadly. (See *Aguilar*, *supra*, 25 Cal.4th at p. 843.) We reject that view, because "a jury could find that ordinary [break dancing] is not the same [activity] as [gymnastic-style break dancing]." (*Solis, supra,* 94 Cal.App.4th at p. 365.)

Based on Etcheto's declaration, a jury could find Hall anticipated the students would engage in ordinary break dancing, with no flipping.[6] However, the jury could find District management personnel (i.e., Gutierrez) *knew* some of these students had recently been engaging in flips, and had explicitly prohibited this practice, but he had failed to disseminate this information or enforce the rules. Hall's deposition shows he did not know some of the students had been flipping on campus recently. Had that information been given to him, he may have declined to open the classroom for dancing, kept a stricter eye on the boys, or at the very least could have provided direct admonishments to the students to curtail their propensity to flip, or cease dancing while he left the classroom. (See *Forgnone*, *supra*, 41 Cal.App.2d at p. 425 ["it requires no speculation to assume that if the supervisor had been present in that [elementary school] room she would have observed the unusual scuffling and rough conduct of the students and she would naturally have commanded them to desist"].)

Although this theory in part overlaps with the negligent supervision theory, it is distinct. A jury could find that the school generally provided adequate supervision, but could also still find that given the failure of school authorities to disseminate throughout

---

[6] Hall testified he did not think break dancing involved flips. Gutierrez also testified he believed there were two different activities involved, break dancing and flipping. On the other hand, at least some of the students evidently thought flips were part of break dancing. We express no view on the ultimate resolution of this issue; it is enough to say that Etcheto's expert opinion itself raises a triable issue about the nature of break dancing.

19

the school the fact that students had performed and subsequently were forbidden to perform these dangerous "flips," the District breached a duty to Jimenez not to expose him to increased risks of harm.

## DISPOSITION

The judgment is reversed with directions to deny the summary judgment motion. The District shall pay Jimenez's costs on appeal.  (See Cal. Rules of Court, rule 8.278.)


_____/s/_____
Duarte, J.

We concur:


_____/s/_____
Nicholson, Acting P. J.


_____/s/_____
Hull, J.