Filed 8/31/17

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| ERIKA GROTHEER, | |
| Plaintiff and Appellant, | E063449 |
| v. | (Super.Ct.No. RIC1216581) |
| ESCAPE ADVENTURES, INC., et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  John W. Vineyard, Judge.

Affirmed.

The Law Office of Robert J. Pecora and Robert J. Pecora for Plaintiff and

Appellant.

Agajanian, McFall, Weiss, Tetreault & Crist and Paul L. Tetreault for Defendants

and Respondents.

1

Plaintiff and appellant Erika Grotheer is a non-English speaking German citizen who took a hot air balloon ride in the Temecula wine country and suffered a fractured leg when the basket carrying her and seven or eight others crash landed into a fence. Grotheer sued three defendants for her injuries: the balloon tour company, Escape Adventures, Inc. (Escape), the pilot and Escape's agent, Peter Gallagher (Gallagher), and Wilson Creek Vineyards, Inc. (Wilson Creek) (collectively, defendants or respondents). Grotheer alleged Escape and Gallagher negligently or recklessly operated the balloon by (1) failing to properly slow its descent during landing and (2) failing to give the passengers safe landing instructions before the launch. Grotheer alleged the hot air balloon company is a common carrier, and as such, owed its passengers a heightened duty of care. (Civ. Code, § 2100.) Grotheer also alleged Wilson Creek was vicariously liable for Escape and Gallagher's conduct because the vineyard shared a special relationship with the balloon company.

The defendants moved for summary judgment, arguing Grotheer could not satisfy the elements of a negligence claim and, even if she could, she had waived the right to assert such a claim by signing Escape's liability waiver before the flight. The trial court agreed Grotheer could not establish the element of duty, finding Grotheer had assumed the risk of her injury under the primary assumption of risk doctrine and, as a result, Escape and Gallagher owed her no duty of care whatsoever. (*Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*).) The trial court entered judgment in favor of defendants, and Grotheer appealed.

Grotheer contends the trial court erred in concluding her claim was barred by primary assumption of risk and reasserts on appeal that Escape is a common carrier. We affirm the judgment, but on a different ground than relied on by the trial court. We hold: (1) a balloon tour company like Escape is not a common carrier subject to a heightened duty of care; (2) the primary assumption of risk doctrine bars Grotheer's claim that Gallagher negligently failed to slow the balloon's descent to avoid a crash landing; and (3) Escape *does* have a duty to provide safe landing instructions to its passengers, but the undisputed evidence regarding the crash demonstrates that any failure on Escape's part to provide such instructions was not the cause of Grotheer's injury.

# I

# FACTUAL BACKGROUND

A. *Preflight*

Grotheer's son, Thorsten, purchased his mother a ticket for a hot air balloon tour with Escape during her visit to California, as a present for her 78th birthday. On the morning of the tour, Grotheer and Thorsten met with the Escape crew and the other passengers in the parking lot of the vineyard owned by Wilson Creek, near the field where Escape launched its balloons. Thorsten later testified at his deposition that when they arrived to check in, he tried to explain his mother's language barrier to the flight crew so Escape could ensure she understood any safety instructions. Thorsten said Gallagher, the pilot, responded by waiving him away and saying, "Everything is going to be fine." Thorsten tried telling two more Escape employees his mother could not understand English, but they appeared to be in a rush and told him he could not be in the

3

immediate launch vicinity if he had not purchased a ticket. At some point during this check-in activity, Grotheer signed Escape's liability waiver, which purported to release the company and its agents from claims based on "ordinary negligence."

Gallagher then drove the passengers to the nearby launch site. Grotheer drove over separately, with Thorsten. In his declaration, Gallagher said he gave the passengers safety instructions during the drive, as is his custom. He said the instructions covered what to do during landing: "I described to my passengers what to expect in terms of lifting off . . . and landing . . . I told them to bend their knees and hold on upon landing, and not to exit the basket until told to do so."

According to passengers Boyd and Kristi Roberts, however, neither Escape nor Gallagher provided safety instructions. Boyd declared he sat in the front passenger seat next to Gallagher during the drive, which lasted a little over a minute and during which Gallagher described his credentials and years of experience. Boyd remembered receiving "a very general informational talk . . . about what to expect on [the] flight," but said "[t]here was no mention of safety issues or proper techniques for take-off and landing." Boyd's wife, Kristi, also rode to the launch site with Gallagher and said she never heard him give instructions, "other than to hold on as we took off."

4

B.    *The Crash*

The tour proceeded without incident until the landing.  According to the four accounts in the record, as the balloon descended at a high rate of speed, the basket crashed into a fence then crashed into the ground and bounced and skidded for about 40 yards before finally coming to a stop, on its side.  By all accounts, the event was forceful and caused the passengers to be tossed about the basket.

Boyd Roberts described the crash landing as follows:  "The balloon was being pushed at a good clip by the wind and we were travelling in a horizontal direction as we were also descending.  We were going sideways, and . . . [b]efore we landed, we actually crashed into and took out several sections of [a] 3 rail fence."  After the basket collided with the fence, it hit the ground "with a hard bump and a bounce."  The passengers were "taken for a wild ride as [the basket] was getting dragged downwind [by the balloon]."  The basket "became more and more horizontal" as it was being dragged.  "We easily skipped 30 or 40 yards, with a couple of hard impacts along the way."  When the basket finally came to rest, it was "on its side, not its bottom," with Grotheer's section on the bottom and Boyd's on top.  He recalled that Grotheer was below him "lying on what was the side of the [basket] which was now the floor."

Kristi Roberts' account of the crash landing matches Boyd's.  She said, "we were going pretty fast towards the ground and it looked like we might hit the fence.  We did hit the fence, as the [basket] crashed in the top of the three rails, and knocked it right apart."  After that, the basket "hit the ground hard."  Kristi recalled, "I was holding on as tight as

5

I could to the [b]asket, but we were all standing up and it was hard to keep from falling over when we crashed into the ground."

Gallagher described the landing similarly, though not in as much detail. He said the balloon had been "descending more quickly than anticipated" and the "passenger compartment of the balloon made a hard landing, first on a fence, then on the ground." He believed the balloon's descent had been hastened by a "false lift," which he described as a condition where the wind travels faster over the top of the balloon than the rest of the balloon. The faster wind creates lift, but when the wind slows the aircraft can quickly lose altitude unless the pilot adds more heat to the balloon's envelope. In his declaration, Gallagher said he "applied as much heat as possible to the envelope to add buoyancy," but the additional heat was not sufficient to arrest the descent before the balloon hit the fence.

In her deposition, Grotheer said the balloon basket experienced two forceful impacts, first with the fence, then with the ground. She recalled she had been holding on to the metal rod in the basket when it hit the fence, but despite holding on, she was "still sliding." She believed her leg broke upon the second impact—when the balloon hit the ground after the collision with the fence. She described her injury as follows: "The people in the balloon, they were all holding. It was hard. It hit the ground hard. And one woman just came like this (indicating)." Grotheer added, "[a]nd the lady is innocent because even her, she was pushed. She was pushed around by the other people in the basket." Grotheer did not think anyone collided with her after that initial impact with the

6

ground.  She explained, "I just got myself real quick together.  [The injury] was just at the beginning."

James Kitchel, Grotheer's expert who has piloted balloons for over 25 years, concluded the cause of the crash landing was Gallagher's "failure to maintain safe control over the 'delta' temperature[,] anticipate changing pressure differentials[,] and counterbalance the effects on the rate of descent."  He disagreed with Gallagher's false lift theory, opining instead the balloon had likely simply experienced a wind shear.  He believed all Gallagher had to do "to avoid this crash entirely" was add "sufficient heat" to the envelope "before the Balloon was already about to crash."

Kitchel explained that many people perceive ballooning as a gentle, peaceful experience, but in reality, balloon rides "can be violent, high speed events with tragic results."  What makes a balloon a risky conveyance is the pilot's inability to directly control the balloon's movement.  A pilot can directly control only the balloon's altitude, which is done by managing the amount of heat added to the balloon's envelope.  The direction and speed of the wind determines lateral movement.  Kitchel stated, "There is no way of steering a Balloon, such as by having a rudder. . . .  [A] Balloon pilot never truly knows where the Balloon is going to land.  He is at the mercy of the wind speed and direction."

Kitchel also opined that the industry standard of care requires a commercial balloon operator to give "at the very least, one detailed safety presentation." According to Kitchel, the Federal Aviation Administration's Balloon Flying Handbook (FAA Handbook) suggests the following safety instructions to prepare passengers for a "firm impact" upon landing: (1) "Stand in the appropriate area of the basket"; (2) "Face the direction of travel"; (3) "Place feet and knees together, with knees bent"; (4) "'Hold on tight' in two places"; and (5) "Stay in the basket." Kitchel did not believe any one particular set of instructions was required and he described the FAA Handbook's safe landing procedures as a "good minimum standard."

C.    *The Complaint*

Grotheer's complaint against defendants alleged she was injured when the balloon "crash land[ed] into a fence located on WILSON CREEK property." She alleged her injury was a result of negligent piloting and failure to provide safety instructions. She also alleged Escape is a common carrier and has a duty to ensure the safety of its passengers.

D.    *The Summary Judgment Motion*

Defendants filed a motion for summary judgment, arguing Grotheer's negligence claim failed as a matter of law because she had assumed the risk of her injury under the primary assumption of risk doctrine. Defendants also sought summary judgment on their liability waiver affirmative defense, claiming Grotheer had expressly waived her right to assert a negligence claim. In opposition, Grotheer argued: (1) the primary assumption of risk doctrine does not apply to common carriers like Escape; (2) the doctrine did not

8

relieve Escape and Gallagher of a duty to avoid the crash landing and to provide safety instructions; and (3) the liability waiver was invalid because Escape knew she did not speak English and could not understand it. Grotheer also argued Wilson Creek was vicariously liable for Escape's breach because the two companies were in a "symbiotic business relationship."

After a hearing, the court concluded it was undisputed hot air ballooning is a risky activity that can involve crash landings, Grotheer assumed the risk of injury from a crash landing by voluntarily riding in the balloon, and defendants owed no duty whatsoever to protect her from her injury. The court also concluded Wilson Creek was not vicariously liable for Escape and Gallagher's conduct. However, the court denied the motion for summary judgment on the liability waiver defense, stating, "there is at least an arguable duress in being separated from her son who was her translator at the time and not understanding the circumstances based on the language. I think that's a triable issue of fact." Based on its finding of no duty, the court concluded Grotheer's negligence claim failed as a matter of law, and it entered judgment in favor of defendants.

## II

## DISCUSSION

A.    *Standard of Review*

A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine

9

whether, despite their allegations, trial is in fact necessary to resolve their dispute."
(*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

A defendant who moves for summary judgment bears the initial burden to show the action has no merit—that is, "one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subds. (a), (p)(2).) Once the defendant meets this initial burden of production, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact. (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851.) "From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law." (*Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1260, 1268-1269.) We review the trial court's ruling on a summary judgment motion de novo, liberally construing the evidence in favor of the party opposing the motion and resolving all doubts about the evidence in favor of the opponent. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) We consider all of the evidence the parties offered in connection with the motion, except that which the court properly excluded.[1] (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

---

[1] Without supporting argument, Grotheer claims the trial court abused its discretion in refusing to consider her objections to defendants' evidence, and her responses to defendants' objections to her evidence, on the ground they were untimely filed on the day of the hearing. We will not consider this claim, however, because Grotheer has not explained why any of her objections or responses had merit, or how she was prejudiced by the court's failure to consider them. (*City of Santa Maria v. Adam*

B.      *Escape Is Not a Common Carrier and Did Not Owe Grotheer a Heightened Duty to Ensure Her Safe Carriage*

Grotheer claims Escape is a common carrier and therefore owed its passengers a heightened duty of care to ensure their safe carriage during the balloon tour.  We conclude a hot air balloon operator like Escape is not a common carrier as a matter of law.

In general, every person owes a duty to exercise "reasonable care for the safety of others," however, California law imposes a heightened duty of care on operators of transportation who qualify as "common carriers" to be as diligent as possible to protect the safety of their passengers.  (Civ. Code, §§ 1714, subd. (a), 2100, 2168.)  "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill."  (Civ. Code, § 2100.)  Contrary to Escape's contention, it is necessary to resolve whether Escape is a common carrier because the heightened duty of care in Civil Code section 2100 precludes the application of the primary assumption of risk doctrine.  (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1161 (*Nalwa*).)

Whether a hot air balloon operator is a common carrier is an issue of first impression in California.[2]  It is also a question of law, as the material facts regarding

_____

(2012) 211 Cal.App.4th 266, 287 ["we may disregard conclusory arguments that . . . fail to disclose [appellant's] reasoning"].)

[2]  The only published case addressing the issue is *Balloons Over the Rainbow, Inc. v. Dir. of Revenue* (Mo. 2014) 427 S.W.3d 815, where a hot air balloon operator argued it was a common carrier under Missouri law for tax purposes.  The Supreme Court of

11

Escape's operations are not in dispute.[3] (*Huang v. Bicycle Casino, Inc.* (2016) 4 Cal.App.5th 329, 339 (*Huang*).)

A common carrier of persons is anyone "who offers to the public to carry persons." (Civ. Code, § 2168.) The Civil Code treats common carriers differently depending on whether they act gratuitously or for reward. (*Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1130 (*Gomez*).) "A carrier of persons without reward must use ordinary care and diligence for their safe carriage." (Civ. Code, § 2096.) But "[c]arriers of persons for reward have long been subject to a heightened duty of care." (*Gomez*, at p. 1128.) Such carriers "must use the utmost care and diligence for [passengers'] safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." (Civ. Code, § 2100; accord, *Gomez*, at p. 1130.) While common carriers are not insurers of their passengers' safety, they are required "'to do all that human care, vigilance, and foresight reasonably can do under the circumstances.'" (*Squaw Valley Ski Corp. v. Superior Court* (1992) 2 Cal.App.4th 1499, 1507.) This duty originated in English common law and is "based on a recognition that the privilege of

---

Missouri upheld the administrative hearing commissioner's determination the operator was not a common carrier because it exercised discretion regarding which passengers to fly and therefore did not "carry all people indifferently," as the statutory definition required. (*Id.* at pp. 825-827.)

[3] Escape claims it stipulated to being a common carrier in its motion for summary judgment. Actually, Escape stated was it was not "controvert[ing] at [that] time the assertion that it is a common carrier." But even if it had so stipulated, we are not bound by agreements that amount to conclusions of law. (E.g., *People v. Singh* (1932) 121 Cal.App. 107, 111.)

serving the public as a common carrier necessarily entails great responsibility, requiring common carriers to exercise a high duty of care towards their customers." (*Ibid*.)

Common carrier status emerged in California in the mid-nineteenth century as a narrow concept involving stagecoaches hired purely for transportation. (*Gomez*, *supra*, 35 Cal.4th at p. 1131.) Over time, however, the concept expanded to include a wide array of recreational transport like scenic airplane and railway tours, ski lifts, and roller coasters. (*Id.* at pp. 1131-1136.) This expansion reflects the policy determination that a passenger's purpose, be it recreation, thrill-seeking, or simply conveyance from point A to B, should not control whether the operator should bear a higher duty to protect the passenger. (*Id*. at p. 1136.)

In *Gomez*, the California Supreme Court concluded roller coasters are common carriers, despite their purely recreational purpose, because they are "operated in the expectation that thousands of patrons, many of them children, will occupy their seats" and are "held out to the public to be safe." (*Gomez, supra*, 35 Cal.4th at p. 1136.) As with other recreational transportation like ski lifts, airplanes, and trains, "the lives and safety of large numbers of human beings" are entrusted to the roller coaster operator's "diligence and fidelity." (*Ibid*., quoting *Treadwell v. Whittier* (1889) 80 Cal. 574, 591.)

Despite the consistent trend toward broadening the common carrier definition to include recreational vehicles, almost a decade after *Gomez* the California Supreme Court refused to apply the heightened duty of care to operators of bumper cars, finding them "dissimilar to roller coasters in ways that disqualify their operators as common carriers." (*Nalwa*, *supra*, 55 Cal.4th at p. 1161.) Crucial to the analysis in *Nalwa* was that bumper

13

car riders "exercise independent control over the steering and acceleration," whereas roller coaster riders "ha[ve] no control over the elements of thrill of the ride; the amusement park predetermines any ascents, drops, accelerations, decelerations, turns or twists of the ride." (*Ibid.*) This difference in control convinced the court that "[t]he rationale for holding the operator of a roller coaster to the duties of a common carrier for reward—that riders, *having delivered themselves into the control of the operator*, are owed the highest degree of care for their safety—simply does not apply to bumper car riders' safety from the risks inherent in bumping." (*Ibid.*, italics added.)

This precedent teaches that the key inquiry in the common carrier analysis is whether passengers expect the transportation to be safe because the operator is reasonably capable of controlling the risk of injury. (*Gomez*, *supra*, 35 Cal.4th at p. 1136; *Nalwa*, *supra*, 55 Cal.4th at p. 1161.) While a bumper car rider maintains a large degree of control over the car's speed and direction, a roller coaster rider recognizes the thrills and unpredictability of the ride are manufactured for his amusement by an operator who in reality maintains direct control over the coaster's speed and direction at all times. (*Gomez*, at p. 1136.) As our high court explained, the roller coaster rider "'expects to be surprised and perhaps even frightened, but not hurt.'" (*Ibid.*)

It is in this critical regard we find a hot air balloon differs from those recreational vehicles held to a common carrier's heightened duty of care. Unlike operators of roller coasters, ski lifts, airplanes, and trains, balloon pilots do not maintain direct and precise control over the speed and direction of the balloon. A pilot directly controls only the balloon's altitude, by monitoring the amount of heat added to the balloon's envelope. A

14

pilot has no direct control over the balloon's latitude, which is determined by the wind's speed and direction. A balloon's lack of power and steering poses risks of mid-air collisions and crash landings, making ballooning a risky activity. (See *Hulsey v. Elsinore Parachute Center* (1985) 168 Cal.App.3d 333, 345-346 [hot air ballooning "involve[s] a risk of harm to persons or property" because pilots cannot "direct their paths of travel . . . [or] land in small, targeted areas"]; Dylan P. Kletter, *Negligence in the (Thin) Air: Understanding the Legal Relationship Between Outfitters and Participants in High Risk Expeditions Through Analysis of the 1996 Mount Everest Tragedy* (2008) 40 Conn. L.Rev. 769, 772 ["hot air ballooning" is a "high-risk activity"].) As Kitchel, Grotheer's expert, put it, a balloon pilot "is at the mercy of the wind speed and direction." (See Holt, *On a Wind and a Prayer* (1997) 83 A.B.A.J. 94, 95 ["winds . . . can transform a wondrous journey into a life-or-death struggle"].)

The mere existence of risk is not sufficient to disqualify a vehicle as a common carrier, however. Roller coasters, ski lifts, airplanes, and trains all pose "inherent dangers owing to speed or mechanical complexities." (*Gomez, supra*, 35 Cal.4th at p. 1136.) But there is a significant difference between the dangers of riding those conveyances and the dangers involved in ballooning. The former can be virtually eliminated through engineering design and operator skill, whereas the latter cannot be mitigated without altering the fundamental nature of a balloon.

Operators of roller coasters, ski lifts, airplanes, and trains can take steps to make their conveyances safer for passengers without significantly altering the transportation experience. For example, roller coaster operators can invest in state of the art

15

construction materials and control devices or task engineers with designing a ride that provides optimal thrills without sacrificing passenger safety. With a balloon, on the other hand, safety measures and pilot training go only so far toward mitigating the risk of mid-air collisions and crash landings. The only way to truly eliminate those risks is by adding power and steering to the balloon, thereby rendering vestigial the very aspect of the aircraft that makes it unique and desirable to passengers.

Because no amount of pilot skill can completely counterbalance a hot air balloon's limited steerability, ratcheting up the degree of care a tour company must exercise to keep its passengers safe would require significant changes to the aircraft and have a severe negative impact on the ballooning industry. For that reason, we conclude Escape is not a common carrier as a matter of law.

C. *The Trial Court Incorrectly Determined Escape Owed Grotheer No Duty of Care*

Having concluded a hot air balloon company does not owe its passengers a heightened duty of care, we must decide whether Escape owed Grotheer *any* duty of care to protect her from her injury. Grotheer claims Escape and Gallagher had a duty to safely pilot the balloon and to provide safety instructions. Escape contends it owed neither duty under the primary assumption of risk doctrine. We analyze each separately.

1. *Balloon piloting and primary assumption of risk*

Grotheer alleges her injury was caused in part by Gallagher's subpar piloting. Her expert opined the cause of the crash was Gallagher's failure to control the speed and

16

direction of the balloon's descent by anticipating changing pressure differentials and maintaining the proper amount of heat in the balloon's envelope.  According to Kitchel, Gallagher could have avoided the crash entirely by "adding sufficient heat . . . in a timely manner."

"'Although persons generally owe a duty of due care not to cause an unreasonable risk of harm to others . . . , some activities . . . are inherently dangerous," such that "[i]mposing a duty to mitigate those inherent dangers could alter the nature of the activity or inhibit vigorous participation.'" (*Nalwa*, *supra*, 55 Cal.4th at p. 1154.)  Primary assumption of risk is a doctrine of limited duty "developed to avoid such a chilling effect." (*Ibid.*)  If it applies, the operator is not obligated to protect its customers from the "inherent risks" of the activity.  (*Id.* at p. 1162.)

"'Primary assumption of risk is merely another way of saying no duty of care is owed as to risks inherent in a given sport or activity.  The overriding consideration in the application of this principle is to avoid imposing a duty which might chill vigorous participation in the sport and thereby alter its fundamental nature.'" (*Jimenez v. Roseville City School Dist.* (2016) 247 Cal.App.4th 594, 601.)  "Although the doctrine is often applied as between sports coparticipants, it defines the duty owed as between persons engaged in any activity involving inherent risks." (*Ibid.*)  The doctrine applies to any activity "done for enjoyment or thrill . . . [that] involves a challenge containing a potential risk of injury." (*Record v. Reason* (1999) 73 Cal.App.4th 472, 482; see *Beninati v. Black Rock City, LLC* (2009) 175 Cal.App.4th 650, 658 [by attending Burning

17

Man festival plaintiff assumed risk of being burned during ritual burning of eponymous effigy].)

The test is whether the activity "'involv[es] an inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity.'" (*Nalwa*, *supra*, 55 Cal.4th at p. 1156.) As we concluded above in the section on common carriers, a balloon's limited steerability creates risks of mid-air collisions and crash landings. Moreover, those risks cannot be mitigated except by adding power and steering, which would fundamentally alter the free-floating nature of a balloon, turning it into a dirigible.[4] "[T]he excitement of [ballooning] is that you never know exactly where you're going to land . . . It's taking something that is unsteerable and trying to steer it. That's the challenge." (Holt, *On a Wind and a Prayer, supra*, 83 A.B.A.J. at pp. 94-95; cf. *Nalwa*, *supra*, 55 Cal.4th at pp. 1157-1158 [refusing to impose liability on bumper car operators for injuries caused in collisions as doing so would have the effect of "decreasing the speed—and ultimately the fun—of the ride"].)

We therefore hold the doctrine applies to crash landings caused by the failure to safely steer a hot air balloon. We further hold Grotheer's claim of pilot error falls under the primary assumption of risk doctrine because the claim goes to the core of what makes balloon landings inherently risky—the challenge of adjusting the balloon's vertical movement to compensate for the unexpected changes in horizontal movement. As a

---

[4] The term "dirigible" literally means "steerable." It comes from the Latin verb *dirigere*, meaning "to direct," and refers to lighter-than-air aircraft capable of being steered, like blimps and zeppelins. (Webster's 3d New Internat. Dict. (1993) p. 642.)

18

result, Escape had no legal duty to protect Grotheer from crash landings caused by its pilot's failure to safely manage the balloon's descent.

To avoid this outcome, Grotheer alleged Gallagher's piloting was not only negligent, but grossly negligent, thereby *increasing* the inherent risk of crash landing. Grotheer is correct the primary assumption of risk does not eliminate an operator's duty to refrain from engaging in reckless conduct that "unreasonably increase[s] the risks of injury beyond those inherent in the activity." (*Nalwa*, *supra*, 55 Cal.4th at p. 1162.) However, she has provided no evidence Gallagher's piloting fell so outside the range of ordinary it unreasonably increased the inherent risk of crash landing.

Gross negligence is a want of even scant care or an extreme departure from the ordinary standard of conduct. (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.) In this context, such extreme conduct might be, for example, launching without sufficient fuel, in bad weather, or near electrical towers; using unsafe or broken equipment; or overloading the passenger basket. In the absence of evidence of such conduct, we hold the primary assumption of risk doctrine bars Grotheer's piloting claim.

Grotheer compares Gallagher's piloting to the conduct of the skier defendant in *Mammoth Mountain Ski Area v. Graham* (2006) 135 Cal.App.4th 1367 (*Mammoth Mountain*), but the analogy is inapt. In *Mammoth Mountain*, a snowboarding instructor was injured when he collided with a skier who had stopped mid-slope to throw snowballs at his brother. The court reversed summary judgment granted on the basis of primary assumption of risk, concluding there was a factual issue as to whether the skier's

19

behavior was so "outside the range of ordinary activity involved in the sport of snowboarding" that it increased the inherent risk of colliding with others on the slope. (*Id.* at pp. 1373-1374.) Gallagher's alleged failure to control the balloon's descent is nothing like the skier's conduct in *Mammoth Mountain*. Skiing does not entail throwing snowballs, whereas managing speed and direction in the face of changing wind conditions is the principal challenge in ballooning. As a result, the failure to surmount that challenge falls squarely within the range of ordinary activity for ballooning.

### 2. *Safety instructions and the duty to take reasonable steps to minimize inherent risks*

Grotheer also claims her injury was caused, at least in part, by Escape's failure to give safety instructions. The trial court rejected this theory of liability when it concluded ballooning was an inherently risky activity and, as a result, Escape owed Grotheer no duty at all to protect her from injury. We conclude that ruling was too broad. Under *Knight*, even an operator of an inherently risky activity owes a duty to take reasonable steps to minimize those inherent risks, if doing so would not fundamentally alter the activity. (*Knight*, *supra*, 3 Cal.4th at p. 317.) As we explain, instructing passengers on safe landing procedures takes little time and effort, and can minimize the risk of passenger injury in the event of a rough landing.

The primary assumption of risk doctrine is limited to those steps or safety measures that would have a deleterious effect on recreational activities that are, by nature, inherently dangerous. (*Record v. Reason*, *supra*, 73 Cal.App.4th at pp. 484-485;

20

*Nalwa*, *supra*, 55 Cal.4th at p. 1162 ["The primary assumption of risk doctrine helps ensure that the threat of litigation and liability does not cause such recreational activities to be abandoned or fundamentally altered in an effort to eliminate or minimize inherent risks of injury"].)  For example, an obligation to reduce a bumper car's speed or the rider's steering autonomy would impede the most appealing aspect of the ride—the ability to collide with others.  (*Id.* at pp. 1157-1158.)  "Indeed, who would want to ride a *tapper car* at an amusement park?"  (*Id.* at p. 1158.)  Similarly, in the context of white water rafting, an obligation to design the rafts to minimize the "risk of striking objects both inside and outside the raft," would transform the activity into "a trip down the giant slide at Waterworld."  (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 256.)  Safety is important, but so is the freedom to engage in recreation and challenge one's limits.  The primary assumption of risk doctrine balances these competing concerns by absolving operators of activities with inherent risks from an obligation to protect their customers from those risks.

What the primary assumption of risk doctrine does not do, however, is absolve operators of *any obligation* to protect the safety of their customers.  (*Knight*, *supra*, 3 Cal.4th at pp. 317-318.)  As a general rule, where an operator can take a measure that would increase safety and minimize the risks of the activity *without also altering the nature of the activity*, the operator is required to do so.  As the court explained in *Knight*, "in the sports setting, as elsewhere, the nature of the applicable duty or standard of care frequently varies with the role of the defendant whose conduct is at issue in a given case."  (*Knight*, at p. 318.)  When the defendant is the operator of an inherently risky

21

sport or activity (as opposed to a coparticipant), there are "steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport [or activity]." (*Id.* at p. 317.)

Even before *Knight*, tort law imposed on operators a duty to take reasonable steps to minimize the inherent risks of their activity. (See *Knight*, *supra*, 3 Cal.4th at p. 317, citing *Quinn v. Recreation Park Assn.* (1935) 3 Cal.2d 725, 728-729; *Shurman v. Fresno Ice Rink* (1949) 91 Cal.App.2d 469, 474-477.) Within our own appellate district we find precedent for imposing on hot air balloon operators and their pilots a duty of care to instruct passengers on how to position themselves for landing.

In *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127 (*Morgan*), Division One of our appellate district held a golf course owner had a duty to design its course to minimize the risk of being hit by a golf ball, *despite the fact such a risk is inherent to golfing*, because doing so was possible "'without altering the nature of [golf].'" (*Id.* at p. 134.) Our colleagues explained this duty stemmed from the fact the defendant was the golf course *owner*. If, on the other hand, the plaintiff had sued the *golfer* who had hit the errant ball, the action would have been barred by the primary assumption of risk doctrine. (*Id.* at pp. 133-134.)

Nearly a decade after *Morgan*, the same court held a race organizer had a duty to minimize the risks of dehydration and hyponatremia[5]—risks inherent to marathons—by

_____

[5] A condition which occurs as a result of decreased sodium concentration in the blood.

22

"providing adequate water and electrolyte fluids along the 26-mile course" because "[s]uch steps are reasonable and do not alter the nature of the sport [of marathon running]." (*Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 179.) Faced with a similar situation in *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, this court held an owner of a motocross track had a duty to provide a system for signaling when riders have fallen in order to minimize the risk of collisions. (*Id.* at p. 1084.) Track owners could satisfy this duty by employing "caution flaggers," or some similar device, which would be relatively easy to implement and would not alter the nature of motocross. (*Ibid.*) As these cases demonstrate, the primary assumption of risk doctrine has never relieved an operator of its duty to take reasonable steps to minimize inherent risks without altering the nature of the activity.

Having determined the primary assumption of risk doctrine does not absolve Escape of a duty to exercise reasonable care in *all* aspects of its operations, we turn to the existence and scope of the duty at issue here—safety instructions. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 [the existence and scope of a duty of care are questions of law for the trial court to determine in the first instance and the appellate court to independently review].) Courts consider several factors in determining the existence and scope of a duty of care, including the foreseeability of harm to the plaintiff, the policy of preventing future harm, and the burden to the defendant and consequences to the community of imposing the duty. (See, e.g., *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 675, fn. 5.)

Foreseeability is the primary factor in the duty analysis. (*Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 366.) Our task in evaluating foreseeability "'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed.'" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772.) The existence and scope of a duty of care "is to be made on a more general basis suitable to the formulation of a legal rule" to be applied in a broad category of cases. (*Id*. at p. 773; *Huang*, *supra*, 4 Cal.App.5th at pp. 342-343.)

In this case, the evidence is undisputed that giving passengers a brief presentation on safe landing procedures (such as the instructions Grotheer's expert cites from the FAA Handbook) is a customary and standard practice in the ballooning industry. To paraphrase Grotheer's expert, these safe landing procedures are: (1) stand in the appropriate area of the basket; (2) face toward or away from the direction of travel, but not sideways (to minimize the risk of a side-impact injury to the hips or knees); (3) place the feet and knees together, and bend the knees; (4) hold on tightly to the rope, handles, or other stabilizing device, and (5) stay inside the basket. Gallagher himself agreed safety instructions are crucial. He said he always explains what passengers can expect during launch and landing. In preparation for landing, he tells them to hold on to the handles, bend their knees, and not to exit the basket until told to do so.

As to foreseeability, undisputed evidence in the record tells us that rough landings are a risk of ballooning and instructing passengers on proper landing positioning can

reduce, though not eliminate, the likelihood of injury in the event the landing does not go smoothly. Additionally, we see no public policy reason why balloon operators should not be required to give safe landing instructions. (*Huang*, *supra,* 4 Cal.App.5th at p. 342.) As Kitchel, an experienced balloon pilot, owner, and operator, explained, "[a] detailed safety briefing takes no more than 5 minutes and is time well spent." While "[m]any balloon landings are gentle, stand-up landings . . . the pilot should always prepare passengers for the possibility of a firm impact," as rough landings can result in severe injuries.

Escape contends the duty to provide safe landing instructions will be overly burdensome to balloon operators, citing the complexity of the preflight instructions operators of passenger-carrying airplanes are required to give under federal regulation. (See 14 C.F.R. § 121.571.) We find the concern misplaced. The duty we recognize here does not compel anything so lengthy or complex as commercial airlines' preflight instructions. It requires only that a commercial balloon operator provide a brief set of safe landing procedures, which Escape's pilot said is already his custom. Safety instructions are a common practice among operators of recreational activities, and we do not believe requiring balloon operators to set aside a few moments before launch to advise passengers how to position themselves in the basket and what to do in the event of a rough landing will have a negative impact on the ballooning industry. (Cf. *Nalwa*, *supra,* 55 Cal.4th at p. 1161 [noting bumper car operator "enforce[d] various riding instructions and safety rules" before giving control of the car's speed and steering to riders]; *Ferrari v. Grand Canyon Dories*, *supra*, 32 Cal.App.4th at p. 251 [operator of

25

white water rafting tour gave plaintiff "safety instructions," such as "where to sit, that it was necessary to hold onto the raft while navigating rapids and where to hold on, and how to react if thrown out of the raft into the water"].) Because the evidence supports Grotheer's allegation Escape failed to give safety instructions of *any* kind to *any* of its passengers, we need not go into precisely what warnings are required, including whether a commercial balloon operator must ensure passengers with known language barriers understand the safety instructions.

We therefore conclude the court incorrectly applied the primary assumption of risk doctrine to absolve Escape of a duty to provide safe landing procedures. However, this conclusion does not end our analysis. We must also consider whether Grotheer's negligence claim fails as a matter of law because she has not demonstrated the existence of a triable issue of fact on causation. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336 ["'[i]t is axiomatic that we review the trial court's rulings and not its reasoning'" and "[t]hus, a reviewing court may affirm a trial court's decision granting summary judgment for an erroneous reason"].)

D.      *Any Lack of Safety Instructions Was Not a Substantial Factor in Causing Grotheer's Injury*

"The elements of actionable negligence, in addition to a duty to use due care, [are] breach of that duty and a proximate or legal causal connection between the breach and plaintiff's injuries." (*Onciano v. Golden Palace Restaurant, Inc.* (1990) 219 Cal.App.3d 385, 394 (*Onciano*).) To be considered a proximate cause of an injury, the acts of the

defendant must have been a "substantial factor" in contributing to the injury. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 969.) Generally, a defendant's conduct is a substantial factor if the injury would not have occurred but for the defendant's conduct. (*Ibid*.) If the injury "'would have happened anyway, whether the defendant was negligent or not, then his or her negligence was not a cause in fact, and of course cannot be the legal or responsible cause.'" (*Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362, 370, citing 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1185, p. 552.) As our high court has explained, "'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor.'" (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.)

While proximate cause ordinarily is a question of fact, it may be decided as a question of law if "'under the undisputed facts, there is no room for a reasonable difference of opinion.'" (*Onciano*, *supra*, 219 Cal.App.3d at p. 395.) As noted, once a defendant claiming the plaintiff cannot satisfy an element of his or her claim meets the initial burden of production, the burden shifts to the plaintiff to demonstrate a triable issue of fact. (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851.) When the evidence supports only one reasonable inference as to the cause of the plaintiff's injury, courts should not engage in "unreasonable speculation that other contradictory evidence exists but was not adduced in the summary judgment proceedings." (*Constance B. v. State of California* (1986) 178 Cal.App.3d 200, 211 [dismissal of negligence claim was proper because no reasonable fact-finder could find a causal nexus between defendant store owner's

27

improper lighting and the assault on plaintiff based on the evidence presented during the summary judgment proceedings].)

As explained in the previous section, the purpose of the safety instructions is to reduce injury in the event of rough landings. Here, however, the undisputed descriptions of the landing establish it was not merely rough, but rather was a forceful and violent event—a *crash*. According to Boyd and Kristi Roberts, whose uncontested descriptions are the most detailed, the basket was descending "pretty fast" when it hit the fence with such force it "knocked it right apart," taking out several fence sections. The basket then hit the ground "hard" and skidded for about 40 yards, becoming more and more horizontal as it was dragged, before coming to a stop on its side with Grotheer's section on the bottom. Gallagher, the pilot, said the balloon had been descending more quickly than he had anticipated when the basket made a "hard landing, first on the fence and then on the ground." Grotheer too described both impacts as "hard." Both Grotheer and Kristi said they had been holding on to the handles (Kristi as tightly as she could) but were unable to keep from slipping or falling.

From these descriptions, we gather the crash landing was a jarring and violent experience, a "wild ride" so forceful that several passengers fell—even one who had tried desperately not to fall by gripping the basket handle as tightly as possible. (See *Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 926 ["If the violence of a crash is the effective efficient cause of plaintiff's injuries to the extent that it supersedes other factors . . . and makes them immaterial, plaintiff cannot recover"].) The accounts of the crash satisfied defendants' burden of demonstrating the violence of the crash, not any lack of

28

instructions, was the proximate cause of Grotheer's injury. The burden then shifted to Grotheer to explain how things may have played out differently had everyone been instructed on proper body positioning during landing. She produced no such evidence. Instead, she said at her deposition she believed everyone had in fact been holding on to the basket handle during the descent. While one could speculate that Kristi had been the only passenger holding the handle *correctly* and the woman who fell into Grotheer had employed an improper grip (say, using only one hand or not holding "tight," as the FAA Handbook instructs), Grotheer presented no evidence to support such a theory. As a result, she did not meet her burden of demonstrating an evidentiary dispute about whether the provision of instructions would have produced a different outcome.

We conclude any failure to instruct on Escape's part was not a proximate cause of Grotheer's injury, and we affirm the grant of summary judgment on that ground. Given our holding that defendants are not liable for negligence, it is unnecessary to review the trial court's ruling on Wilson Creek's vicarious liability or its ruling on defendants' liability waiver defense.[6]

---

[6] Defendants asked us to review the ruling on their affirmative defense in the event we reversed the trial court's grant of summary judgment, citing California Code of Civil Procedure section 906, which allows a respondent, without appealing from a judgment, to seek appellate review (at the court's discretion) of any ruling that "substantially affects the rights of a party," for "the purpose of determining whether or not the appellant was prejudiced by the error . . . upon which he relies for reversal." Because we do not reverse the grant of summary judgment, we need not reach the issue of defendants' affirmative defense.

29

### III

### DISPOSITION

We affirm the judgment.  The parties shall bear their costs on appeal.

CERTIFIED FOR PUBLICATION

<u>SLOUGH</u>
                                                            J.

We concur:

<u>RAMIREZ</u>
                P. J.

<u>CODRINGTON</u>
                J.