Filed 10/21/22; Certified for Publication & Modified 11/21/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KYLE BROWN, as represented, etc.,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>BEACH HOUSE DESIGN & DEVELOPMENT,<br><br>      Defendant and Respondent. | B314946<br><br>(Los Angeles County<br>Super. Ct. No. 19STCV20315) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary Y. Tanaka, Judge.  Reversed.

Dordick Law Corporation, Gary A. Dordick and John M. Upton, for Plaintiff and Appellant.

Yee & Associates, Steven R. Yee and William G. Sorkin, for Defendant and Respondent.

———————————

Plaintiff Kyle Brown (plaintiff) was severely injured when he fell from a significant height while working as a carpenter at a

construction site. Plaintiff alleged that he fell from defective scaffolding, and he sued the general contractor and the scaffolding subcontractor for negligence. The trial court granted summary judgment for the general contractor, concluding that plaintiff's claims against it were barred by exceptions to the peculiar risk doctrine articulated by the California Supreme Court in *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*) and subsequent authority.

We reverse. While *Privette* and subsequent cases held that a general contractor cannot be vicariously liable for the negligence of its subcontractors, plaintiff's claim against the general contractor alleged direct, not vicarious, liability. Further, there were triable issues of material fact as to whether the general contractor fully delegated to the scaffolding subcontractor the duty to maintain the scaffolding in a safe condition. The motion for summary judgment therefore was improperly granted.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Background.

Defendant Beach House Design and Development (Beach House) was the general contractor responsible for remodeling a residence in Hermosa Beach, California (the property). Beach House subcontracted with O'Rourke Construction, Inc. (O'Rourke) to do finish carpentry, and with A&D Plastering Co. (A&D) to erect scaffolding and to patch plaster. Plaintiff, a carpenter, was employed by O'Rourke.

On June 16, 2017, O'Rourke's carpenters, including plaintiff, were on the property to mill, prime, and install window casings. After lunch, while working by himself, plaintiff fell from the north side of the building onto a concrete walkway, suffering

2

severe injuries. It appears that no one saw plaintiff fall, and plaintiff has no recollection of the incident.

After plaintiff's fall, Jeffrey Strnad, Beach House's principal, and Alex Daniels, A&D's principal, inspected the scaffolding above the area where plaintiff fell. They found that some of the scaffolding was not properly secured to the building, and planks, crossbars, ties, and guardrails had been cut or were missing. Both men said the scaffolding was not safe to use in that condition.

## II. The present action; Beach House's motion for summary judgment.

Plaintiff, through his guardian ad litem Barbara Brown, sued Beach House for negligence. Plaintiff asserted that he had fallen from scaffolding Beach House had failed to properly maintain, resulting in permanent injuries, substantial medical expenses, and loss of income. In September 2019, plaintiff filed an amendment substituting A&D for a Doe defendant.

Beach House moved for summary judgment. It asserted that under *Privette* and its progeny, a general contractor is liable to a subcontractor's employee for an injury resulting from an unsafe workplace only if the general contractor affirmatively contributed to the conditions that led to the injury. In the present case, Beach House asserted there was undisputed evidence that it did not supply the scaffolding or any other equipment used by plaintiff, did not control the manner or means by which plaintiff performed his work, and did not take any affirmative act that contributed to plaintiff's injury. That evidence included the following:

Plaintiff was an employee of O'Rourke, with whom Beach House subcontracted to install casings for windows and exterior

3

doors, do interior door trim work, frame bay windows, waterproof exterior doors, and install exterior siding. The subcontract between Beach House and O'Rourke provided that O'Rourke would furnish "all materials, labor, tools, supplies, equipment, permits, services, and supervision necessary for completion of the scope of work [as] noted in the attached proposal."

The scaffolding on the property was provided and installed by A&D, which also did plastering work on the project. The A&D subcontract provided that Beach House would pay A&D $8,495 to install the scaffolding and $1,500 to do plaster work. The subcontract further provided that A&D would "furnish scaffold and equipment that may be necessary to do the Work expeditiously," "provide traffic and safety controls at all times while using such equipment at the Project," and "[promptly] remove and replace any defective material, damaged [*sic*] caused by Subcontractor or Work upon notice from Contractor, Owner or Architect."

Strnad, Beach House's managing member, stated in a declaration that Beach House did not direct the means or methods of the work performed by O'Rourke or its employees, including plaintiff, and it did not provide any equipment or materials to O'Rourke. Beach House also did not direct the means or methods of the work performed by A&D. Strnad had "no information that Beach House and/or its employees contributed in any way to the purportedly defective railing on the scaffolding, plaintiff's purported slipping, and/or plaintiff's purported fall."

4

### III. Plaintiff's opposition to motion for summary judgment.

Plaintiff opposed the motion for summary judgment. He contended there were triable issues as to whether Beach House furnished dangerous equipment to plaintiff and negligently exercised control over the job site, including the scaffolding. Specifically, he asserted there was evidence that Beach House retained control over the safety of the job site through its safety plan and daily walk-throughs, and that Beach House was responsible for procuring and maintaining the scaffolding for the use of its subcontractors and their employees, including O'Rourke and plaintiff. That evidence included the following:

Tony O'Rourke, an O'Rourke principal, testified that in his experience, scaffolding usually is provided by the general contractor.[1] O'Rourke had never set up scaffolding or chosen a scaffolding company, and O'Rourke's bid for the work in this case did not include the cost of scaffolding. O'Rourke expected that Beach House would provide scaffolding because O'Rourke's scope of work included installing second and third story windows, which could not be reached without scaffolding.

Alex Daniels, an A&D principal, testified that he and his son Danny were the A&D employees who erected scaffolding and inspected it for safety. Once scaffolding was erected, it was not Daniels's practice to inspect it daily; Daniels believed daily inspection of the scaffolding was the responsibility of the superintendent or contractors. A&D did not have an agreement with Beach House about allowing other subcontractors to use the

---

[1]   Throughout this opinion, we will use "O'Rourke" to refer both to Tony O'Rourke and O'Rourke Construction.

scaffolding, but Daniels never told Beach House not to allow other contractors to use the scaffolding.

Strnad, Beach House's principal, testified that Beach House subcontracted with A&D to erect, maintain, supervise, and tear down the scaffolding. Beach House's employees did not inspect the scaffolding after it was erected because Strnad believed "that wasn't our role or duty in the contract with A&D. Their responsibility was to furnish the scaffold. They took full responsibility to supervise the scaffold and maintain it."

Matthew Linden, Beach House's site supervisor, testified that he never inspected the scaffolding to ensure it was in a safe condition because that was A&D's responsibility. He agreed, however, that A&D was not on site every day; to the contrary, he said A&D's plastering work took only about six months, but the scaffolding remained on the job site for at least a year. Linden acknowledged that A&D employees did not come to the site to inspect the scaffolding on days they were not performing work, and he said that during periods when A&D was not on site, he was not aware that anyone was making sure the scaffolding was safe.

Linden authenticated a weekly task document prepared by Beach House stating that during the week of June 12, 2017, A&D "[s]et scaffolding at West and South Elev for Mezz desk fascia and trim installation," "[s]et scaffolding on top of Canopy for South elev siding installation," and "[i]ncrease[d] scaffolding height at East front elev for siding installation." Linden agreed that this document suggested Beach House had instructed A&D to erect scaffolding for the use of O'Rourke and his employees. Linden also authenticated an invoice from A&D to Beach House for "Scaffold Rental—invoice due for scaffold rental above

6

contract for 05/17/2017 through 06/17/2017 (32 days at $84.95 per day)."

## IV.  Order granting summary judgment; appeal.

The trial court granted the motion for summary judgment on May 26, 2021.  It explained that under *Privette*, a general contractor is not liable for injuries suffered by a subcontractor's employee unless (1) the general contractor retained control over the subcontractor's work and the exercise of control affirmatively contributed to the employee's injuries, or (2) the general contractor provided unsafe equipment that affirmatively contributed to the subcontractor's employee's injury.  In the present case, Beach House provided competent evidence that it did not retain control over how plaintiff performed his work, did not provide equipment to plaintiff, and did not contribute to any purported defect in the scaffolding.  In response, plaintiff presented evidence that Beach House maintained a safety plan that included daily walk-throughs, had supervisory responsibility over the job site, and provided the scaffolding.  The court found that plaintiff's evidence did not establish that any of Beach House's affirmative conduct caused plaintiff's injuries because Beach House did not direct the means or methods by which plaintiff conducted his work.  Further, plaintiff's evidence did not establish that Beach House was responsible for the condition of the scaffolding because plaintiff's evidence "actually confirms that the scaffold was provided by A&D," not Beach House.  The court thus concluded that plaintiff had failed to establish that an exception existed to the *Privette* doctrine.

The trial court entered judgment for Beach House on July 23, 2021.  Plaintiff timely appealed.

7

# DISCUSSION

## I.  Standard of review.

" 'A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." [Citation.]

" 'A defendant who moves for summary judgment bears the initial burden to show the action has no merit—that is, "one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to [that] cause of action."  (Code Civ. Proc., § 437c, subds. (a), (p)(2).)  Once the defendant meets this initial burden of production, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact.  [Citation.]  "From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law."  [Citation.]  We review the trial court's ruling on a summary judgment motion de novo, liberally construing the evidence in favor of the party opposing the motion and resolving all doubts about the evidence in favor of the opponent.  [Citation.]  We consider all of the evidence the parties offered in connection with the motion, except that which the court properly excluded. [Citation.]' (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1292–1293.)" (*Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1085–1086.)

## II. Applicable law.

### A. The *Privette* doctrine.

At common law, a person who hired an independent contractor to perform a task generally was not liable to third parties for injuries caused by the independent contractor's negligence. Central to this rule of nonliability " 'was the recognition that a person who hired an independent contractor had " 'no right of control as to the mode of doing the work contracted for.' " ' " (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 598 (*SeaBright*).)

The "peculiar risk" doctrine created an exception to the common law rule that a hirer is not liable for the torts of an independent contractor. Under the doctrine of peculiar risk, "a person who hires an independent contractor to perform work that is inherently dangerous can be held liable for tort damages when the contractor's negligent performance of the work causes injuries to others. By imposing such liability without fault on the person who hires the independent contractor, the doctrine seeks to ensure that injuries caused by inherently dangerous work will be compensated, that the person for whose benefit the contracted work is done bears responsibility for any risks of injury to others, and that adequate safeguards are taken to prevent such injuries." (*Privette*, *supra*, 5 Cal.4th at p. 691.) The doctrine of peculiar risk thus represents a limitation on the common law rule and a corresponding expansion of hirer vicarious liability.

In its 1993 decision in *Privette*, *supra*, 5 Cal.4th 689, the California Supreme Court held that the peculiar risk doctrine did not apply to injured employees of independent contractors. *Privette* concerned a roofing contractor's employee who was injured when he fell off a ladder and was burned by hot tar. The

9

employee sued the owner of the home he had been roofing, contending that the homeowner was liable for his injuries under the doctrine of peculiar risk. (*Id.* at pp. 692–693.) The Supreme Court held that while the homeowner would be liable to an "innocent bystander" (*id.* at p. 701) injured by the independent contractor's negligence, he was not liable to the independent contractor's employee. The court explained: "[T]he peculiar risk doctrine seeks to ensure that injuries caused by contracted work will not go uncompensated, that the risk of loss for such injuries is spread to the person who contracted for and thus primarily benefited from the contracted work, and that adequate safety measures are taken to prevent injuries resulting from such work. [Citation.] But in the case of on-the-job injury to an employee of an independent contractor, the workers' compensation system of recovery regardless of fault achieves the identical purposes that underlie recovery under the doctrine of peculiar risk. It ensures compensation for injury by providing swift and sure compensation to employees for any workplace injury; it spreads the risk created by the performance of dangerous work to those who contract for and thus benefit from such work, by including the cost of workers' compensation insurance in the price for the contracted work; and it encourages industrial safety." (*Ibid.*) Thus, the court concluded, "when considered in light of the various goals that the workers' compensation statutes seek to achieve, [the conclusion] that peculiar risk liability should extend to the employees of the independent contractor, does not withstand scrutiny." (*Id.* at pp. 701–702.)

In subsequent cases, the Supreme Court expanded the *Privette* doctrine to hold that a hirer could not be held vicariously liable to an independent contractor's employees under a variety of

10

tort theories. (E.g., *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [hirer of an independent contractor not liable to contractor's employee for failing to specify that the contractor should take special precautions to avert a risk]; *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235 [hirer of an independent contractor not liable to contractor's employee for negligent hiring]; *Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 522 (*Tverberg*) ["Having assumed responsibility for workplace safety, an independent contractor may not hold a hiring party vicariously liable for injuries resulting from the contractor's own failure to effectively guard against risks inherent in the contracted work"], italics omitted.)

## B.  *Hooker* and *McKown*:  negligent exercise of retained control.

In 2002, our Supreme Court issued two companion decisions addressing the circumstances in which a contractor's employee may sue the hirer of the contractor for negligent exercise of retained control over a worksite. *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*) concerned the death of a crane operator, Hooker, who was killed on a California Department of Transportation (Caltrans) site. The decedent was employed by a general contractor hired by Caltrans to construct a highway overpass. The overpass was 25 feet wide, and the crane with the outriggers extended was 18 feet wide, so Hooker had to retract the crane's outriggers to allow other construction vehicles to pass. Shortly before the fatal accident, Hooker retracted the outriggers; he then attempted to swing the boom without first reextending the outriggers, causing the crane to tip over. Hooker was thrown to the pavement and killed. (*Id.* at p. 202.)

11

Hooker's widow sued Caltrans, asserting it had negligently exercised control over the job site. The trial court granted Caltrans's motion for summary judgment, and the Supreme Court affirmed. The court explained that a hirer may be liable for a contractor's employee's injury only when the hirer's conduct "affirmatively contributed" to the employee's injury. (*Hooker*, *supra*, 27 Cal.4th at pp. 211–212.) In the case before it, although Caltrans was aware that Hooker was retracting the crane's outriggers to allow traffic to pass, it had not ordered him to do so. (*Id.* at p. 214.) Under these circumstances, the court said Caltrans's actions had not affirmatively contributed to Hooker's death. It explained: "[U]nder the standard we announce today, summary judgment was appropriate here. Plaintiff raised triable issues of material fact as to whether defendant retained control over safety conditions at the worksite. However, plaintiff failed to raise triable issues of material fact as to whether defendant *actually exercised* the retained control so as to affirmatively contribute to [Hooker's death]. While the evidence suggests that the crane tipped over because the crane operator swung the boom while the outriggers were retracted, and that the crane operator had a practice of retracting the outriggers to permit construction traffic to pass the crane on the overpass, there was no evidence Caltrans's exercise of retained control over safety conditions at the worksite affirmatively contributed to the adoption of that practice by the crane operator. There was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it." (*Id.* at p. 215, italics added.)

The court reached a different result in *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 (*McKown*). Plaintiff

12

McKown was an employee of an independent contractor hired by Wal-Mart to install speakers in the ceilings of Wal-Mart stores. Wal-Mart requested that the contractor use Wal-Mart's forklifts whenever possible and furnished McKown a forklift for his use. (*Id.* at p. 223.) That forklift was defective, and McKown was injured as a result. (*Ibid.*)

A jury found that Wal-Mart was negligent in providing the contractor with unsafe equipment and allocated 23 percent of the responsibility for the accident to Wal-Mart. The Supreme Court affirmed. (*McKown, supra*, 27 Cal.4th 219.) It explained that in *Hooker*, it had held "that a hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but that a hirer is liable to an employee of a contractor insofar as a hirer's exercise of retained control affirmatively contributed to the employee's injuries." (*Id.* at p. 225.) Thus, "when a hirer of an independent contractor, by negligently furnishing unsafe equipment to the contractor, affirmatively contributes to the injury of an employee of the contractor, the hirer should be liable to the employee for the consequences of the hirer's own negligence." (*Ibid.*) In other words, " 'where the hiring party actively contributes to the injury by supplying defective equipment, it is the hiring party's own negligence that renders it liable, not that of the contractor.' " (*Id.* at p. 225.)

Subsequent to *Hooker* and *McKown*, the Supreme Court noted in *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 671 (*Kinsman*) that a useful way to understand its cases "is in terms of delegation." It explained that while an independent contractor generally is presumed to have delegated to a subcontractor the duty to provide a safe workplace for the subcontractor's

employees, "when the [independent contractor] does not fully delegate the task of providing a safe working environment, but in some manner actively participates in how the job is done, and that participation affirmatively contributes to the employee's injury, the hirer may be liable in tort to the employee." (*Ibid*.)

Most recently, our Supreme Court clarified the *Hooker/McKown* exception to the *Privette* rule[2] in *Sandoval v. Qualcomm Inc.* (2021) 12 Cal.5th 256 (*Sandoval*). There, it reaffirmed that although under its precedents a hirer presumptively delegates to an independent contractor the responsibility to do work safely, the hirer retains a duty of care to the contractor's employees if it does not *fully* delegate control to the independent contractor. (*Id.* at pp. 269, 274.) To establish that the hirer owes a duty of care to the contractor's employees, therefore, the plaintiff must establish both that the hirer retained control over the contracted work, and that the hirer actually exercised that retained control in a manner that affirmatively contributed to the contract worker's injury. (*Id.* at p. 274.) The court noted, however, that neither "actual exercise" nor "affirmative contribution" require that the hirer's alleged negligence consist of an affirmative act. Instead, "[t]he hirer's negligence may take the form of any act, course of conduct, or failure to take a reasonable precaution that is within the scope of

---

[2] Plaintiff suggests that *Hooker* and *McKown* articulate two different exceptions to the *Privette* rule. In fact, as Beach House notes, *Hooker* and *McKown* represent different applications of the same exception—namely, that a hirer will be liable when it exercises control over any part of an independent contractor's work in a manner that affirmatively contributes to a worker's injuries. (See *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 42.)

its duty under *Hooker*. . . . [¶] If a plaintiff proves that the hirer actually exercised retained control in a way that affirmatively contributed to the contract worker's injury, the plaintiff establishes that the hirer owed the contract worker a duty of reasonable care as to that exercise of control." (*Id.* at pp. 277–278.)

## III. Triable issues of material fact exist as to whether Beach House negligently exercised retained control by furnishing unsafe scaffolding to O'Rourke and its employees.

Under the authorities discussed above, whether Beach House owed a duty of care to plaintiff turns on whether it retained control over plaintiff's performance of the contracted-for work and exercised control in a way that contributed to plaintiff's injuries. Although plaintiff will have the burden of proof at trial, it was Beach House's burden on summary judgment to demonstrate the absence of triable issues of material fact as to these issues—that is, that plaintiff cannot prevail on his claim as a matter of law.

The central allegation of plaintiff's complaint is that plaintiff fell from the scaffolding because Beach House failed to maintain it in a safe condition. Beach House acknowledged in its motion for summary judgment that a general contractor may be liable for providing unsafe equipment to a subcontractor that causes injury to the subcontractor's employee, but it urged it had no duty to inspect or maintain the scaffolding because it did not "supply, control, or assemble" it.

It appears undisputed that A&D, *not* Beach House, supplied and erected the scaffolding. That fact alone is not dispositive of Beach House's motion for summary judgment,

15

however. As we have said, a general contractor may exercise retained control over a job site by "requesting [a subcontractor] to use the [general contractor's] own defective equipment in performing the work." (*Gonzalez v. Mathis*, *supra*, 12 Cal.5th at pp. 46–47, citing *McKown*, *supra*, 27 Cal.4th at pp. 225–226.) If it does so, the general contractor need not own the allegedly defective equipment to be liable for injuries caused by its use—instead, under the principles discussed above, the general contractor may assume a duty of care to its subcontractor's employees if it "undert[akes] to arrange and supply" equipment for the employees' use. (See, e.g., *Browne v. Turner Construction Co.* (2005) 127 Cal.App.4th 1334, 1345.)

Where a general contractor contracts with a third party to supply equipment for the use of its subcontractors, the contractor's potential liability to its subcontractors' employees for defective equipment turns on the extent of the contractor's delegation to the third party—that is, whether the contractor "fully delegate[d]" to the third party the duty to maintain the equipment in a safe condition. (*Kinsman v. Unocal Corp.*, *supra*, 37 Cal.4th at p. 671; *Sandoval*, *supra*, 12 Cal.5th at p. 274.) If the general contractor fully delegates to the third party the duty to provide safe equipment, the third party is responsible for any failure to take reasonable precautions to keep the equipment in a safe condition. But if the general contractor does *not* fully delegate the task of providing safe equipment, it may be liable in tort to an employee. (*Sandoval*, at p. 671; see also *Kinsman*, at p. 671; *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120 [cited with approval in *Ray*; reversing grant of summary judgment for independent contractor where there was a triable issue as to whether the general contractor, who was alleged to

16

have acted negligently by failing to close a road, had retained the sole authority to close the road].)

Applying these principles to the present case suggests that the essential questions for purposes of Beach House's motion for summary judgment are (1) whether Beach House undertook to supply scaffolding for the use of O'Rourke and its employees, (2) whether Beach House fully delegated to A&D the alleged duty to provide and maintain the scaffolding, and (3) if Beach House did *not* fully delegate the responsibility to maintain the scaffolding to A&D, whether it exercised its retained control in a manner that affirmatively contributed to plaintiff's injury. As we discuss, there are triable issues of material fact as to each of these questions.

A. **There are triable issues of fact as to whether Beach House undertook to supply scaffolding for O'Rourke and its employees.**

In support of its motion for summary judgment, Beach House asserted through the declaration of its principal, Strnad, that it "did not provide any equipment or materials to O'Rourke to perform its work," including the scaffolding. Beach House also relied on subcontracts it entered into with A&D and O'Rourke, which required the subcontractors to "furnish all labor, materials, equipment, and other facilities required to complete the Work" and to "furnish scaffold and equipment that may be necessary to do the Work."

In response, plaintiff contended that triable issues of material fact existed as to whether Beach House procured the scaffolding for the use of O'Rourke's employees (as well as for others), therefore assuming a duty of care for its maintenance. Plaintiff cited the following evidence in support:

17

● O'Rourke's work on the project included installing exterior trim on the second and third floors, which required the use of scaffolding.

● Tony O'Rourke testified that in his experience, scaffolding typically is provided by the general contractor for the use of its subcontractors. O'Rourke's bid on the project did not include the cost of scaffolding because he understood scaffolding would be provided by Beach House.

● O'Rourke observed other subcontractors using the scaffolding erected by A&D, and he believed he and his employees had permission to use it. He has never asked for permission to use scaffolding on a job site, and he was not told not to use the scaffolding in connection with this project. After plaintiff's accident, he and his employees were permitted to use the scaffolding once it was repaired.

● A&D's plastering work took about six months, but the scaffolding remained up on the property for more than a year.

● Beach House's site manager was aware that O'Rourke's employees made regular use of the scaffolding, and he never asked them not to do so.

● A task document prepared by Beach House stated that during the week of June 12, 2017, A&D increased the height of the scaffolding "for siding installation." The siding was installed by O'Rourke's employees. Beach House's site manager acknowledged that the task document appeared to instruct A&D to "erect scaffolding for the use of O'Rourke Construction employees."

● Beach House paid an invoice from A&D to Beach House dated June 29, 2017 "for scaffold rental."

18

Taken together, this evidence would allow a reasonable jury to conclude that Beach House undertook to provide scaffolding for the use of its subcontractors, including plaintiff.

**B.      There are triable issues as to whether Beach House fully delegated to A&D the responsibility to provide and maintain the scaffolding.**

Beach House contended below that even if it undertook to provide scaffolding for the use of O'Rourke and its employees, it delegated to A&D through the Beach House/A&D subcontract the responsibility to provide and maintain the scaffolding, and thus any failure to do so properly was a breach of A&D's duty, not Beach House's. The undisputed facts did not support this conclusion, however.

As an initial matter, we cannot conclude with certainty that the A&D subcontract provided by Beach House in support of its motion for summary judgment remained in effect at the time of plaintiff's injury on June 16, 2017. That subcontract defined A&D's scope of work with reference to the "attached proposal," which stated that A&D would "[s]et scaffolding where needed for lathing and plastering *for a period of 90 days*." (Italics added.) Other documents provided in connection with the motion for summary judgment suggested that the scaffolding was initially erected on September 20, 2016, approximately nine months before the accident. Accordingly, we cannot conclude that Beach House and A&D were continuing to operate under the terms of the A&D subcontract in June 2017.

In any event, even if the subcontract remained in effect in June 2017, it did not clearly set forth who was responsible for inspecting and maintaining the scaffolding after its installation— that is, during the more than one-year period that the scaffolding

19

remained up on the property. Beach House suggested that inspection and maintenance of the scaffolding was A&D's responsibility under paragraph 5.1(4) of the contract, which addressed "safety controls" relating to the scaffolding. Paragraph 5.1(4), however, said only that A&D would furnish scaffolding and "provide traffic and safety controls at all times *while using such equipment at the Project.*" (Italics added.) In other words, while this paragraph appeared to require A&D to provide safety controls while *A&D's* employees were using the scaffolding, it did not clearly require A&D to provide such controls at other times or for the protection of other subcontractors or their employees.

Nor did other evidence before the trial court establish that there were no triable issues of material fact as to who had the responsibility to maintain the scaffolding in a safe condition. Beach House's principal, Strnad, and its site manager, Linden, testified that it was A&D's responsibility, not Beach House's, to inspect the scaffolding and safely maintain it. But A&D's principal, Daniels, testified that once scaffolding is erected, he does not examine it on a daily basis because it is the responsibility of "the superintendent or contractors on a daily basis to inspect." Daniels further testified that when he contracts to erect scaffolding on a job site, he relies on the general contractor to monitor the scaffolding during periods when he and his employees are not actively working at the site and to "stop people from making alterations to [the] scaffolding." And, although site manager Linden testified that he believed A&D was responsible to insure the safety of the scaffolding, he conceded he knew A&D employees did not come to the job site to inspect the scaffolding on days they were not performing plastering work.

20

For all of these reasons, there are triable issues of material fact as to whether Beach House fully delegated to A&D the responsibility to maintain the scaffolding during the duration of the project.

Further, we reject Beach House's suggestion that plaintiff is judicially estopped from urging that Beach House was responsible for maintaining the scaffolding because he asserted otherwise in his opposition to A&D's motion for summary judgment. The opposition to which Beach House refers was not before the trial court when it ruled on Beach House's motion for summary judgment, and thus it is not a proper part of our appellate record. (See, e.g., *People v. Avila* (2004) 117 Cal.App.4th 771, 780, fn. 4 ["We review the correctness of the trial court's ruling at the time it was made and not by reference to evidence produced at a later date"]; *In re Zeth S.* (2003) 31 Cal.4th 396, 405 ["It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration' "].) In any event, to establish judicial estoppel, Beach House must establish, among other things, that the party against whom judicial estoppel is asserted " 'was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true)' " and " 'the two positions are totally inconsistent.' " (*The Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 842.) In the present case, Beach House has not shown either that plaintiff successfully asserted that A&D was responsible for maintaining the scaffolding or that the plaintiff's position on appeal and in opposition to A&D's motion for summary judgment were inconsistent. To the contrary, we see no inconsistency in the

21

assertion that Beach House and A&D had nonexclusive responsibility for maintaining the scaffolding in a safe condition. Accordingly, Beach House has not established that plaintiff's claim is barred by the doctrine of judicial estoppel.

Finally, we reject Beach House's suggestion that liability in the present case is barred by *Brannan v. Lathrop Construction Associates, Inc.* (2012) 206 Cal.App.4th 1170, 1172 (*Brannan*). There, a bricklayer's employee was injured when he fell from scaffolding erected by another subcontractor. But unlike in the present case, the plaintiff in *Brannan* did not allege that the scaffolding had been provided by the general contractor for his use or that it was defective. To the contrary, it was undisputed that the parties had agreed that the bricklayer's employees would *not* use the scaffolding. (*Id.* at p. 1174.) The court's holding in *Brannan* that summary judgment had been properly granted for the general contractor, therefore, is not relevant to our analysis.

C. **There are triable issues as to whether Beach House exercised retained control in a manner that affirmatively contributed to plaintiff's injury.**

Finally, Beach House contended below that because plaintiff did not allege it engaged in any *affirmative* misconduct, it could not be liable for plaintiff's injury as a matter of law. Not so. As noted above, our Supreme Court has explained that the critical inquiry for purposes of evaluating the exercise of retained control "is the relationship between the [general contractor's] conduct and the [subcontractor's] conduct, *not* whether the [general contractor's] conduct, assessed in isolation, can be described as 'affirmative conduct.'" (*Sandoval*, *supra*, 12 Cal.5th at p. 277, italics added.) That is, "neither 'actual exercise' nor

22

'affirmative contribution' requires that the [general contractor's] negligence (if any) consist of an affirmative act. The [general contractor's] negligence may take the form of any act, course of conduct, *or failure to take a reasonable precaution that is within the scope of its duty* under *Hooker*. (See Rest.3d Torts, Liability for Physical and Emotional Harm, § 3, com. c, pp. 29–30; *Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3 [noting that a hirer may be liable based on *failing* to undertake a promised safety measure]; *Ray*, *supra*, 98 Cal.App.4th at pp. 1133–1134 [finding triable issue on affirmative contribution where hirer retained exclusive authority over road barricades and *failed* to erect barricade around fallen debris that contractor was trying to clear when injury occurred].)" (*Sandoval*, at p. 277, italics added.)

Under this standard, were a jury to conclude that Beach House assumed a duty to provide scaffolding for the use of O'Rourke employees and that it failed to fully delegate to A&D the duty to maintain the scaffolding in a safe condition, it could also reasonably conclude that Beach House's alleged failure to inspect and maintain the scaffolding gave rise to liability. Accordingly, there are triable issues as to whether Beach House exercised retained control in a manner that affirmatively contributed to plaintiff's injury.[3]

---

[3] Because we are reversing the grant of summary judgment, we will deny Beach House's request for appellate sanctions for pursuing a frivolous appeal.

## DISPOSITION

The judgment is reversed.  Appellant is awarded his appellate costs.  Respondent's request for appellate sanctions is denied.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:


EGERTON, J.


ADAMS, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24

Filed 11/21/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KYLE BROWN, as represented, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BEACH HOUSE DESIGN & DEVELOPMENT, <br><br> Defendant and Respondent. | B314946 <br><br> (Los Angeles County Super. Ct. No. 19STCV20315) <br><br> ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 21, 2022, be modified as follows:

On page 16, in the second sentence of the first full paragraph, change the citation from "*Sandoval*, at p. 671" to "*Sandoval*, at p. 274" and change "cited with approval in *Ray*" to "cited with approval in *Sandoval*" so the citation reads:

> "But if the general contractor does *not* fully delegate the task of providing safe equipment, it may be liable in tort to an employee. (*Sandoval*, at p. 274; see also *Kinsman*, at p. 671; *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th

1120 [cited with approval in *Sandoval*; reversing grant of summary judgment for independent contractor where there was a triable issue as to whether the general contractor, who was alleged to have acted negligently by failing to close a road, had retained the sole authority to close the road].)"

[There is no change in the judgment.]

The opinion in the above-entitled matter filed October 21, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

EDMON, P. J.            EGERTON, J.            ADAMS, J.*

_____

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2